**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| _____ ) | |
| ) | |
| ) | |
| NORTHERN STATES POWER COMPANY, ) | |
| a Wisconsin corporation, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.    12-cv-602 |
| ) | |
| THE CITY OF ASHLAND, WISCONSIN; ) | |
| SOO LINE RAILROAD COMPANY; ) | |
| and WISCONSIN CENTRAL, LTD., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## COMPLAINT

Plaintiff Northern States Power Company, a Wisconsin corporation ("NSPW"),

by its undersigned counsel, hereby alleges as follows:

## NATURE OF ACTION

1.     This is a civil action brought pursuant to federal and state law, including the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended

by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 *et seq.*

("CERCLA" also known as "Superfund"), relating to an environmental cleanup proceeding in

Ashland, Wisconsin.

2.     The environmental cleanup addresses contamination at the Ashland/Northern

States Power Lakefront Site, located along the shore of Chequamegon Bay, Lake Superior, in

Ashland, Ashland County, Wisconsin.  The Ashland/Northern States Power Lakefront Site is

bordered by U.S. Highway 2 to the south, Prentice Avenue to the east, Ellis Avenue to the west,

and Lake Superior's Chequamegon Bay to the north ("Ashland Site").  The Ashland Site consists

of approximately 40 acres and has been divided by the United States Environmental Protection Agency ("EPA") into four areas of concern: (a) Chequamegon Bay; (b) soils and shallow groundwater in Kreher Park; (c) soils and shallow groundwater in the Upper Bluff/Filled Ravine; and (d) deep groundwater in the Copper Falls Aquifer underlying the Upper Bluff. *See* Illustrative Site Map (Ex. 1 hereto). This action involves NSPW's claims for past and future response costs incurred in connection with the Chequamegon Bay and Kreher Park areas (referred to herein as the "Ashland Facility") and natural resource damages associated with the Ashland Site. NSPW does not seek the recovery of response costs or damages in this action for the cleanup of the Upper Bluff/Filled Ravine or the deep groundwater in the Copper Falls Aquifer underlying the Upper Bluff at this time.

3. NSPW, a Wisconsin public utility, is a current owner of a small portion of property within the Ashland Site on which, from 1885 to 1947, a manufactured gas plant ("MGP") that provided gas to the Ashland community was located. The MGP was located within the area known as the Upper Bluff/Filled Ravine area of the Ashland Site. NSPW never owned nor operated the MGP itself, but acquired the property on which the MGP was located in 1986 from a former public utility, Lake Superior District Power Company. Lake Superior District Power Company had owned the MGP since approximately 1922, when it purchased the plant from Ashland Light Power & Street Railway Company, who itself had acquired the MGP from earlier owners. The MGP ceased operations in 1947, decades before NSPW acquired the property. Since NSPW acquired the MGP property, it has utilized the former MGP property as an equipment, repair and storage facility.

4. Commercial, municipal and industrial activities have been conducted at and adjacent to the Ashland Site from at least the late 1800s. Based on investigations conducted

2

from 1991 to the present, the EPA and the Wisconsin Department of Natural Resources ("WDNR") (collectively, the "Agencies") have determined that the Ashland Site is contaminated by, *inter alia*, polycyclic aromatic hydrocarbons ("PAHs") and volatile organic compounds ("VOCs"), including without limitation, concentrations of PAHs in the form of tars and oils, commonly referred to as nonaqueous phase liquids ("NAPL"), as well as metals and pesticides and their components (collectively, "Contaminants of Concern" or the "COCs").

5.      Under the Agencies' oversight, NSPW has undertaken extensive investigatory, remedial, and other activities at the entire Ashland Site (not just the portion NSPW currently owns) consistent with the National Contingency Plan, including without limitation, the performance of a Remedial Investigation and Feasibility Study ("RI/FS"), soil, groundwater and sediment sampling, ecological and human health risk assessments, environmental forensic investigations, site characterizations, historic potentially responsible party ("PRP") investigations, and interim removal actions.

6.      NSPW entered into an Administrative Order on Consent ("AOC") with EPA on November 16, 2003, to perform the RI/FS under EPA's oversight. *See* CERCLA Docket No. V-W-04-C-764 (Nov. 16, 2003) (Ex. 2 hereto). The objectives of the RI/FS were to determine the nature and extent of contamination and any threat to human health at the Ashland Site, to determine and evaluate alternatives for remedial action at the site, and to collect data for developing and evaluating remedial alternatives. NSPW completed the RI/FS in 2008, and EPA issued a notice of completion for the AOC in 2010.

7.      EPA's decision on the remedial action to be implemented at the Ashland Site is embodied in a final Record of Decision ("ROD"), executed on September 30, 2010, on which the State of Wisconsin gave its concurrence.

3

8.      NSPW has entered into a Consent Decree with the United States and the State of Wisconsin lodged with this Court on August 8, 2012.  *See* Case No. 12-cv-00565, Complaint (Dkt. No. 1) and Consent Decree Between the United States, Wisconsin, Northern States Power Company, and the Bad River and Red Cliff Bands of the Lake Superior Tribe of Chippewa Indians (Dkt. No. 2) ("2012 Consent Decree") (Exs. 3 and 4 hereto, attachments omitted).  The remedial design and remedial action to be conducted by NSPW pursuant to the 2012 Consent Decree pertains only to the selected remedy specified in the ROD for the on-land portions of the Site (Kreher Park; Upper Bluff/Filled Ravine; and the deep groundwater in the Copper Falls Aquifer), referred to as the "Phase 1 Project Area," and not to the sediments in Chequamegon Bay.  The cost of the cleanup for the Phase 1 Project Area is estimated at $40 million.

9.      Under the 2012 Consent Decree, NSPW also must reimburse the United States for certain future response costs incurred by EPA.

10.     Under the 2012 Consent Decree, NSPW also must make substantial payment (in the form of a land conveyance of nearly 1,400 acres) to federal, state and tribal natural resource trustees to resolve all alleged injury to, destruction of, or loss of use or impairment of natural resources associated with the Ashland Site.  The Department of Interior (as represented by the U.S. Fish and Wildlife Service) and the Department of Commerce (as represented by the National Oceanic and Atmospheric Administration) have asserted that they are federal trustees for natural resources at or near the Ashland Site.  WDNR has asserted that it is a state trustee for natural resources at or near the Ashland Site.  The Bad River and Red Cliff Bands of the Lake Superior Tribe of Chippewa Indians (the "Tribes") have asserted that they are trustees for natural resources at or near the Ashland Site.  The U.S. Fish and Wildlife Service, the National Oceanic Atmospheric Administration, WDNR, and the Tribes (collectively, "Trustees") participated in

4

the negotiation of the 2012 Consent Decree with respect to natural resource damages and support the 2012 Consent Decree.

11. Per the requirements of 42 U.S.C. § 9622(d)(2), the 2012 Consent Decree has been submitted for public comment. *See* 77 Fed. Reg. 48,541 (Aug. 14, 2012).

12. NSPW will continue to incur response costs as the investigation and cleanup proceeds in the Phase 1 Project Area pursuant to the 2012 Consent Decree, and NSPW may incur response costs in connection with Chequamegon Bay. The investigation and cleanup for both portions of the Ashland Facility are not complete, and substantial work remains to be done.

13. NSPW's cooperative actions to date and obligations pursuant to the 2012 Consent Decree have and will impact the utility's ratebase customers.

14. Although the Agencies have identified other responsible parties who are liable as a result of those parties' operations at and/or ownership of the Ashland Facility, including Defendants the City of Ashland ("City"), the Soo Line Railroad Company (d/b/a Canadian Pacific Railway) ("Soo Line") and Wisconsin Central Ltd. ("Wisconsin Central"), only NSPW has cooperated with the Agencies in taking any significant action to perform work or fund investigation or cleanup efforts at the Ashland Facility.

15. Other responsible parties, such as the John Schroeder Lumber Company who operated at the Ashland Site from approximately 1901 through 1939 ("Schroeder Lumber"), appear to no longer exist or are otherwise defunct and, therefore, represent an "orphan share" at the Ashland Facility.

16. As a result, NSPW (and/or its ratebase customers) have inequitably borne the full burden for addressing the investigation and cleanup of the Ashland Facility to date. NSPW has

incurred well in excess of its fair equitable share of the Ashland Facility's response costs and natural resource damages for the Ashland Site.

17.     NSPW brings this lawsuit to: (1) establish the liability of Defendants under federal and state law for the contamination of the Ashland Facility; (2) determine Defendants' equitable shares of the costs of investigating and cleaning up the Ashland Facility, and of the compensation paid to the Trustees for alleged natural resource damages and assessment costs related to the Ashland Site; and (3) require Defendants to pay their fair portion of those costs.

## JURISDICTION

18.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 42 U.S.C. § 9601 *et seq*. and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over NSPW's state law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b) because: (a) the events giving rise to the claims asserted herein are based on operations and activities that took place in this District; (b) the Ashland Facility is located entirely within this District; and (c) each of the Defendants is located and/or does or has done business in the District.

20.     Venue is also proper pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District.

## PARTIES

21.     Plaintiff NSPW is a corporation organized and existing under the laws of Wisconsin.  NSPW is an operating utility primarily engaged in the generation, transmission, distribution and sale of electricity in portions of northwestern Wisconsin and in the western portion of the Upper Peninsula of Michigan.  NSPW provides electric utility service to approximately 251,000 customers and natural gas utility service to approximately 107,000

customers.  In the State of Wisconsin, NSPW is regulated by the Public Service Commission of Wisconsin.

22.     Defendant THE CITY OF ASHLAND is a Wisconsin municipal corporation organized under the laws of the State of Wisconsin, with its principal place of business located in Ashland, Wisconsin.  The City received a Special Notice of Liability Letter from the EPA, dated April 27, 2011, notifying the City of its responsibility for the Ashland Site under CERCLA § 107(a), 42 U.S.C. § 9607(a).  The City has owned a large portion of Kreher Park since at least 1942—including various facilities from which releases or disposal of hazardous substances have occurred.  The City also has operated in and/or around the Kreher Park portion of the Ashland Site since at least the late 1800s.  The City's activities have resulted in the release and/or disposal of hazardous substances at the Ashland Facility.

23.     Defendant SOO LINE RAILROAD COMPANY is a Minnesota corporation, doing business in the State of Wisconsin, with its principal place of business in Minneapolis, Minnesota.  Upon information and belief, Soo Line is the successor to, among other entities, the Minneapolis, St. Paul and Sault Ste. Marie Railway, the Minneapolis, St. Paul and Sault Ste. Marie Railroad Company, the Wisconsin Central Railway Company, the Wisconsin Central Railroad Company, and the Duluth, South Shore & Atlantic Railroad.  Soo Line received a Special Notice of Liability Letter from the EPA, dated April 27, 2011, notifying Soo Line of its responsibility for the Ashland Site under CERCLA § 107(a), 42 U.S.C. § 9607(a).  Soo Line and/or its predecessors, owned and/or operated a railroad corridor through the Kreher Park area of the Ashland Site, and other related facilities, from at least the 1870s through 1987, which ownership and operation resulted in the release and/or disposal of hazardous substances at the Ashland Facility.

24.     Defendant WISCONSIN CENTRAL LTD. is an Illinois corporation, doing business in the State of Wisconsin, with its principal place of business in Homewood, Illinois. Wisconsin Central received a Special Notice of Liability Letter from the EPA, dated April 27, 2011, notifying Wisconsin Central of its responsibility for the Ashland Site under CERCLA § 107(a), 42 U.S.C. § 9607(a).  Wisconsin Central acquired the existing railroad corridor through the Kreher Park area of the Ashland Site, and other related facilities, in 1987 from the Soo Line. Wisconsin Central is a subsidiary of Canadian National Railway.

## FACTUAL BACKGROUND

### A.      The Ashland Site

25.     EPA placed the Ashland Site on the National Priorities List in September 2002.

26.     The Ashland Site consists of property and other facilities currently owned by the City, Wisconsin Central and NSPW, among others.  NSPW's property is on the Upper Bluff/Filled Ravine portion of the Ashland Site.  The City and Wisconsin Central own portions of, and other facilities within, Kreher Park.

27.     The Kreher Park portion of the Ashland Site consists of approximately 13 acres of man-made, reclaimed ("landfilled") former lakebed.  Kreher Park currently consists of a swimming beach, a boat landing, an RV park and adjoining open space east of Prentice Avenue and to the east of the Ashland Site.  For purposes of this Complaint, and to be consistent with other Ashland Site documents, the portion of the Ashland Site to the west of Prentice Avenue, east of Ellis Avenue and north of the NSPW property is referred to as "Kreher Park."  See Ex. 1. Kreher Park has been used for multiple industrial activities since the late 1800s, including but not limited to the following, all of which, upon information and belief, involved COCs:  (a) lumbering, sawmill and wood treating activities; (b) railroad operations including the loading and off-loading of materials; (c) unregulated dumps; (d) sewers; (e) a former ponded area of

8

wood treatment residuals; (f) a municipal wastewater treatment plant; (g) construction, demolition and filling activities; (h) waste disposal, treatment and transfer; and (i) discharges from municipal sewer systems.

28.    From approximately 1901 through 1939, Schroeder Lumber owned and operated a large portion of Kreher Park.  The County of Ashland acquired ownership of the former Schroeder property after the demise of Schroeder Lumber.  The City purchased the Schroeder property from the County in 1942 and has since exercised dominion and control over the former Schroeder property as well as additional portions of Kreher Park.  As alleged below, numerous construction activities and other operations by the City and others have resulted in the disposal, re-disposal and mobilization of COCs and the release of COCs at, from, and/or to Kreher Park and Chequamegon Bay.

29.    The Chequamegon Bay portion of the Ashland Site consists of approximately 16 acres directly off-shore from Kreher Park that the Agencies have determined is impacted by COCs.  In addition to releases from Kreher Park, NSPW is informed and believes that Chequamegon Bay was historically used for commercial shipping, including wood and iron ore. Chequamegon Bay also contains wood waste and other debris from, *inter alia*, the former Schroeder property and the demolition and fill activities conducted by the City and others.

30.    The City informed WDNR about potential contamination of Kreher Park in 1989. In 1991, WDNR completed an initial assessment of the Ashland Site and determined that further environmental investigation should occur.

31.    In 1994, WDNR initiated a more comprehensive investigation and evaluation of the area.  WDNR named NSPW as a PRP in 1995 for waste purportedly from the former MGP. WDNR notified the City and Wisconsin Central of their responsibility in 1997.

32.    Beginning in 1995, NSPW performed and/or funded a series of investigations to,
*inter alia*, characterize the purported subsurface contamination and affected sediments at the
Ashland Site and identify PRPs for the Ashland Site.  NSPW initially performed its
investigations on the Upper Bluff/Filled Ravine portions of the Ashland Site, and WDNR
investigated Kreher Park and the sediments.  Costs that WDNR incurred as part of its
investigations at Kreher Park and the sediments were resolved in the case captioned *Wisconsin v.
NSP*, Ashland County Circuit Court, Case No. 04-CV-118.  NSPW also performed two interim
removal actions at the Ashland Site:  (a) installing a contaminant-recovery system to pump and
treat contaminants from the Copper Falls Aquifer; and (b) excavating contaminated soil and
installing a low permeability cap and a groundwater extraction well.

33.    NSPW subsequently signed an AOC with EPA on November 16, 2003, to
perform the aforementioned RI/FS at the Ashland Site.  (Ex 2 hereto).  NSPW completed the
RI/FS in 2008, and EPA issued a notice of completion for the AOC in 2010.

34.    In September 2010, EPA issued its ROD setting forth EPA's selected remedy for
the Ashland Site.  On April 27, 2011, EPA issued Special Notice of Liability Letters to the City,
Soo Line, Wisconsin Central and NSPW, informing those parties of their alleged liability and
seeking the negotiation of a consent decree to implement the remedy selected in the ROD.  Good
faith settlement offers from the parties were universally rejected by EPA, and, on information
and belief, NSPW was the only party to return to the negotiating table with an enhanced
settlement offer in negotiating the 2012 Consent Decree.

35.    NSPW has been in close cooperation with EPA and WDNR throughout the
investigation of the Ashland Site and the CERCLA administrative process, including taking the
leading role on site investigations, preparing technical work plans, remediation plans and design

reports, implementing interim actions and providing project management and technical support. NSPW is the only potentially responsible party to undertake such efforts.

36.     NSPW negotiated in good faith with the Agencies, and pursuant to the 2012 Consent Decree filed under CERCLA §§ 106 and 107 (Ex. 4 hereto), NSPW is required to (i) perform the work to clean up the Upper Bluff/Filled Ravine, Kreher Park and Copper Falls portions of the Ashland Site, (ii) reimburse the United States for certain future costs (including interest), and (iii) fully compensate the natural resource Trustees for natural resource damages and assessment costs for the entire Ashland Site.  NSPW continues to negotiate in good faith with the Agencies about the potential remediation of Chequamegon Bay.

**B.     The John Schroeder Lumber Company (Orphan Share)**

37.     In the early 1900s, approximately a dozen lumber mills lined the Ashland lakefront.  Schroeder Lumber was a corporation organized under the laws of Wisconsin in 1881 and was headquartered in Milwaukee, Wisconsin.

38.     In 1901, Schroeder Lumber purchased an existing lumber mill on the site referred to herein as Kreher Park.  Schroeder Lumber expanded the facility's lumber and wood processing operations and shipping facilities on the lakefront.  Upon information and belief, in Ashland, Schroeder Lumber operated one of the largest and best equipped mills in the country at the time.  Schroeder maintained a vertically integrated business structure, cutting timber, railroading and shipping, and processing and milling lumber into finished commercial and consumer products, which it marketed.  The company operated a number of affiliates, including Schroeder Mills & Timber Co., Schroeder Timber Products Co., Schroeder Land & Timber Co., Northern Pacific Logging Co., J-S Refrigeration Division, Schroeder Manatee Company, and the toy-making Playskool Institute.

39.     During the height of its operations in Ashland, Schroeder Lumber operated 24 hours per day during the summer season, employed anywhere between 50 and more than 350 men, and produced upwards of 75 million board feet annually.  In the Kreher Park portion of the Ashland Site, Schroeder Lumber operated, *inter alia*, a saw mill, planing mill, machine shop, electric light plant, lath mill, wood treatment facility, oil houses, a kiln, a refuse burner, pulpwood hoist, and dock piling operation.  Schroeder Lumber's finished products included railroad ties, poles, dock pilings, rough and finished lumber, lath, shingles, flooring, and other commercial and consumer wood products.  NSPW is informed and believes that the Ashland location was Schroeder's only wood processing facility.

40.     Schroeder Lumber used a variety of COC-containing substances at the Ashland Facility in its operations and as wood preservers as part of the company's wood preservation and treatment operations, including, but not limited to petroleum, diesel, oils, and creosote.  In 1991, the State of Wisconsin reported documented dumping of creosote-treated wood preservatives at the Schroeder operations.

41.     The primary industrial process that Schroeder Lumber employed to treat wood at the Ashland Site was an open-tank, dip-treatment operation.  The preservation process involved Schroeder Lumber employees dipping railroad ties and other wood materials into large, wooden, above-ground, tank-like structure(s) filled with creosote or other wood preserving substances containing COCs.

42.     During this treatment process, spills from the tank were reportedly ubiquitous.  Once dipped, Schroeder Lumber employees would remove the wood from the tank, scrape off excess wood treatment compounds and allow the wood to drip dry in stacked piles on the ground in the vicinity of the dip treating tank.

12

43.     NSPW is informed and believes that Schroeder Lumber's lumber and wood processing operations continued at the Ashland Facility at least through 1939.

44.     NSPW is informed and believes that, as a result of Schroeder Lumber's operations, Schroeder Lumber released and/or disposed of COCs that have caused, contributed to and/or exacerbated the contamination of Chequamegon Bay and Kreher Park.  Schroeder Lumber also generated a significant amount of wood waste and wood processing residuals that are still present at the Ashland Facility.

45.     Because Schroeder Lumber no longer exists, and no successor has yet been identified, its liability for the Ashland Facility is considered to be an "orphan share."  However, the City subsequently owned and exercised dominion and control over the former Schroeder property, taking actions that resulted in the significant contribution to and/or exacerbation of contamination at the Ashland Facility, including mobilization of COCs in Kreher Park and Chequamegon Bay.

### C.     The City of Ashland

46.     In 1942, the City purchased the former Schroeder Lumber property and its facilities (now part of the portion of the Ashland Site known as Kreher Park) from the County of Ashland.  By the time the City purchased the Schroeder Lumber property, site structures had been razed, fixtures removed, and foundations dynamited.  NSPW is informed and believes that the wood treatment dipping structures had also been demolished and the COC-containing substances were left on site and permitted to sink into, run off and pool on the ground, creating the former "pond" of wood treatment residuals, which is sometimes referred to as the misnamed "coal tar dump" or "waste tar dump."  The City began a land assembly along the lakefront and later acquired additional parcels in western Kreher Park from the Soo Line in 1986.

47.     NSPW is informed and believes that the City's industrial and municipal activities at and near the Ashland Facility, both before and after the City's purchase of the Schroeder property, caused, contributed to, and/or exacerbated the COC contamination of the Ashland Facility, including the mobilization of COCs in Kreher Park to Chequamegon Bay.  Upon information and belief, the City acted with the intent to arrange for the disposal of hazardous substances.

48.     Despite the City's own statements to EPA admitting the City is a liable party under CERCLA, the City has refused to perform any work or fund any investigation or cleanup of the Ashland Site.  Indeed, despite months of NSPW's attempts to negotiate reasonable terms of access to allow NSPW and its contractors on the City property in Kreher Park to perform the cleanup work required by the 2012 Consent Decree, the City has refused and continues to refuse to grant NSPW access.

49.     Upon information and belief, the City's activities on the former Schroeder property also resulted in a significant amount of wood waste and debris and wood processing residuals disposed of in Chequamegon Bay.  Upon information and belief, the City disposed of this material with the intent to arrange for the disposal of hazardous substances.

### 1.     The City's Uncontrolled Waste Disposal Landfill Operations

50.     During the 1800s and early 1900s, the City regularly disposed of, and permitted/authorized the disposal of, wastes directly into Chequamegon Bay and into ravines transecting the lakefront area in the vicinity of the Ashland Site.

51.     Among other activities, the City reclaimed the lakebed in the Kreher Park portion of the Ashland Site by directly transporting and dumping (and permitting others to transport and dump) into Chequamegon Bay solid, municipal, construction and demolition, and industrial waste materials.  The City has admitted to dumping activities in Kreher Park.

14

52.     Upon information and belief, the City's unregulated waste disposal practices resulted in the discharge of COCs to the Ashland Facility, and caused, contributed significantly to, and/or exacerbated the contamination of the Ashland Facility, including the mobilization of COCs from Kreher Park to Chequamegon Bay.  Upon information and belief, the City acted with the intent to arrange for the disposal of hazardous substances.

### 2.     The City's Uncontrolled Sewage And Wastewater Discharges

53.     Prior to the City's construction of its municipal wastewater treatment plant ("WWTP") in 1951, the City discharged, and/or authorized or permitted the discharge of, all sanitary sewage and industrial wastewater directly to Chequamegon Bay without treatment. Upon information and belief, the sewage and wastewater discharged by the City, and/or authorized or permitted to be discharged, contained COCs that caused, contributed to and/or exacerbated the contamination of the Ashland Facility, including the mobilization of COCs from Kreher Park to Chequamegon Bay.  Upon information and belief, the City acted with the intent to arrange for the disposal of hazardous substances.

54.     Indeed, the City's historic discharges into Chequamegon Bay caused or contributed to outbreaks of a typhoid fever epidemic that caused deaths throughout the City in the early 1900s.  NSPW is informed and believes that the City built the WWTP only after the Wisconsin Board of Health (WDNR's predecessor) threatened penalties and the City was sued by the State of Wisconsin for repeated failure to comply with Wisconsin law.

55.     At all relevant times, NSPW is informed and believes the City owned and/or operated (and/or authorized, required or permitted) a sewer system, consisting of surface and/or subsurface sewers, culverts, ditches and other drainage features resulting in the discharge and migration of COCs that caused, contributed to, and/or exacerbated the contamination of the Ashland Facility, including the mobilization of COCs from Kreher Park to Chequamegon Bay.

Upon information and belief, the City acted with the intent to arrange for the disposal of hazardous substances.

56.     Additionally, NSPW is informed and believes that the City also owned and/or operated an open sewer from at least 1901 to 1951—located at the western end of Kreher Park— through which COCs were discharged.  Upon information and belief, discharges from the open sewer to the Ashland Site contained COCs, and caused, contributed to, and/or exacerbated the contamination of the Ashland Facility, including the mobilization of COCs from Kreher Park to Chequamegon Bay.  Upon information and belief, the City acted with the intent to arrange for the disposal of hazardous substances.

### 3.      The City's Construction and Excavation Activities

57.     From approximately 1951 until 1992, the City owned, operated and maintained a WWTP in the Kreher Park portion of the Ashland Site.

58.     The City constructed the WWTP in 1951, and subsequently expanded the WWTP in 1973.  The WWTP was decommissioned in 1992, but still exists today at the Ashland Site.

59.     Upon information and belief, the City conducted activities incident to the construction and expansion of the WWTP—including without limitation excavation, trenching, pumping and discharge of groundwater, grading, and installation of underground equipment— that caused, contributed to, and/or exacerbated the contamination of the Ashland Facility, by, *inter alia*, dispersing, transporting, redisposing, mobilizing and discharging COCs, and generally accelerating the spread and mobilization of COCs throughout the Ashland Facility.

60.     The City has admitted in statements to EPA that it is certain some contaminants were disturbed and disposed during the WWTP construction and expansion.  NSPW is informed and believes that the City and its contractors encountered during the construction and expansion of the WWTP wood debris, creosote and other materials, and that large quantities of these

16

materials were mobilized through their excavation and redisposed at the Ashland Facility. NSPW is informed and believes that the City and its contractors encountered during the construction and expansion of the WWTP sizeable volumes of COC-impacted groundwater, which they pumped directly to Chequamegon Bay without treatment. Upon information and belief, the City disposed of this material with the intent to arrange for the disposal of hazardous substances.

61.     NSPW is informed and believes that during the City's period of ownership of Kreher Park and in connection with construction of the WWTP, the City installed a network of subsurface sewers, drainpipes, and/or culverts, including for the purpose of draining (and backfilling) the "pond" portion of Kreher Park—a relic of Schroeder Lumber's wood treatment operation that was created during the demolition of the Schroeder facilities—directly, and without treatment, to the Chequamegon Bay portion of the Ashland Site. Upon information and belief, the City's installation, ownership, maintenance, and/or operation of subsurface sewers, drainpipes, and/or culverts for the purpose of draining the "pond" caused, contributed to and/or exacerbated the contamination of the Ashland Facility, by, *inter alia*, dispersing, transporting, redisposing, mobilizing and discharging COCs, and generally accelerating the spread of COCs throughout the Ashland Facility.

62.     Additionally, in the mid-1980s, the City conducted construction activities to extend Ellis Avenue, which serves as the western border of the Ashland Site. The City excavated a large area of thick, heavy, creosote tar near the railroad tracks, and disposed of the same at the Ashland Site, to the south of the WWTP. The City admits in statements to EPA that it is probable that contaminants were disturbed and moved during the Ellis Avenue extension by the City's own trucks. Upon information and belief, the City's disposal of contaminated soils

17

from the Ellis Avenue excavation at the Ashland Site caused, contributed to and/or exacerbated the contamination of the Ashland Facility, by, *inter alia*, dispersing, transporting, redisposing, mobilizing and discharging COCs, and generally accelerating the spread of COCs throughout the Ashland Facility.  Upon information and belief, the City disposed of these materials with the intent of arranging for the disposal of hazardous substances.

63.     In 1992, the City conducted construction activities to install the Prentice Avenue lift station, on the eastern portion of the Ashland Site.  Upon information and belief, the City excavated soils and fill containing COCs, and subsequently deposited and spread the same around the Site as fill, or backfill, with the intent of arranging for disposal of hazardous substances.  Upon information and belief, the City's disposal of contaminated soils from the Prentice Avenue excavation at the Site caused, contributed to and/or exacerbated the contamination of the Ashland Facility, by, *inter alia*, dispersing, transporting, redisposing, mobilizing and discharging COCs, and generally accelerating the spread of COCs throughout the Ashland Facility.

### 4.     The City's Uncontrolled Discharges From The WWTP

64.     Agency records indicate that the City discharged COCs to the Ashland Facility as part of its operation and decommissioning of the WWTP.  After construction of the WWTP in 1951, the City continued to chronically discharge millions of gallons of raw sewage and wastewater to Chequamegon Bay each year, without treatment.  Upon information and belief, the raw sewage and wastewater discharged by the City contained COCs, and caused, contributed to and/or exacerbated the contamination of the Ashland Facility, including the mobilization of COCs from Kreher Park to Chequamegon Bay.  Upon information and belief, the City discharged this material with the intent to arrange for the disposal of hazardous substances.

18

65.     Additionally, NSPW is informed and believes that beginning at least as early as the decommissioning of the WWTP in 1992, contaminated water routinely collected in the basement of the WWTP.  At all relevant times, the City addressed the infiltration of such contaminated water by pumping the contaminated water directly to the Bay, without treatment. Upon information and belief, the City pumped this material to the Bay with the intent to arrange for the disposal of hazardous substances.

66.     In 1997, WDNR tested water collected from the basement of the WWTP, determined that it contained elevated levels of COCs (including naphthalene and other PAH and VOC compounds), and directed the City to cease its uncontrolled discharge of contaminated water to Chequamegon Bay.

67.     Upon information and belief, the City's uncontrolled discharges of contaminated water from the WWTP caused, contributed to and/or exacerbated the contamination of the Ashland Facility by, *inter alia*, dispersing, transporting, redisposing, mobilizing and discharging COCs, and generally accelerating the spread and mobilization of COCs throughout the Ashland Facility.

### 5.     The City's Uncontrolled Stormwater Discharges

68.     Agency records indicate that the City discharged, and/or authorized or permitted the discharge of, stormwater and/or urban runoff directly to Chequamegon Bay without treatment.  The City owned and operated a combined storm and sanitary sewerage system from approximately the 1890s until the early to mid-1980s, at which time the storm sewer system was separated from the sanitary system to reduce flow to the WWTP.  The City historically discharged and/or authorized or permitted to be discharged stormwater and/or urban runoff from these systems directly to Chequamegon Bay without treatment, through outfalls within the Ashland Site.

19

69.     Beginning in 2003, the City rerouted certain stormwater lines through a water quality treatment basin located at the north end of 5th Avenue, but continued to discharge, and/or authorize or permit the discharge of, the collected water to Chequamegon Bay through different outfalls in the vicinity of the Kreher Park RV park area, east of the Site.  NSPW is further informed and believes that the City continued to discharge, and/or authorize or permit the discharge of, untreated stormwater directly to Chequamegon Bay within the Ashland Site through at least one "bypass" outfall, which runs along Prentice Avenue through the Site, and discharges to Chequamegon Bay in the vicinity of the WWTP.

70.     Upon information and belief, the stormwater and/or urban runoff discharged and/or authorized or permitted to be discharged by the City contained COCs that caused, contributed to and/or exacerbated the contamination of the Ashland Facility, including the mobilization of COCs from Kreher Park to Chequamegon Bay.  Upon information and belief, the City acted with the intent to arrange for the disposal of hazardous substances.

**D.     Soo Line Railroad Company**

71.     From the early 1870s to 1987, Soo Line and/or its predecessors owned and operated on large portions of Kreher Park, including railway operations on the railroad right-of-way, spur tracks located throughout Kreher Park, a commercial dock, rail cars, and other facilities throughout Kreher Park.

72.     Upon information and belief, Soo Line and/or its predecessors serviced the former Schroeder Lumber facility, the former MGP and the former commercial dock, and engaged in activities such as loading, off-loading and transporting materials containing COCs, including wood treatment materials, tars, oils and petroleum products, and engaged in or authorized dredging activities in or near the Ashland Facility.  Upon information and belief, Soo Line's

and/or its predecessors' operations resulted, caused, contributed to and/or exacerbated the contamination the Ashland Facility.

73.     Upon information and belief, Soo Line and/or its predecessors dumped COC-containing substances such as tars and oils and other materials along the railroad tracks and shoreline in Kreher Park.  NSPW is informed and believes that Soo Line's and/or its predecessors' railroad activities, including dumping in Kreher Park, caused, contributed to and/or exacerbated the contamination of the Ashland Facility.  Upon information and belief, Soo Line dumped this material with the intent of arranging for disposal of hazardous substances.

**E.     Wisconsin Central Ltd.**

74.     From approximately 1987 to the present, Wisconsin Central has owned the historic railroad corridor that traverses the Ashland Site.  Wisconsin Central acquired the existing railroad corridor, and related facilities, from the Soo Line.

75.     Upon  information and belief, in or about the mid-1980s, Soo Line created a wholly-owned division titled Lake States Transportation Division to own and operate approximately 2,000 miles of its rail lines, including the property and related facilities Soo Line owned and operated in Ashland at Kreher Park.  Wisconsin Central purchased the Lake States division from Soo Line, including the property in Ashland, in or about October of 1987.

76.     Upon information and belief, Wisconsin Central also is a successor to relevant liabilities of Soo Line arising out of the ownership and operation of the railroad corridor, and related facilities, within the Ashland Facility.

**F.     NSPW's Expenditures To Investigate And Cleanup The Ashland Site**

77.     Beginning with the onset of the Agencies' investigation in 1991, and continuing to the present, NSPW has provided the Agencies with substantial cooperation and support in investigating and remediating the Ashland Site, including PRP investigation costs.

78.     Although Defendants caused, contributed to, mobilized and/or exacerbated alleged contamination at the Ashland Facility, to date, NSPW is the only potentially responsible party that has cooperated with the Agencies to perform work and/or fund the investigation and cleanup.  NSPW's cooperative actions and commitments have and will impact its ratebase customers.

79.     In fulfillment of obligations under the 2012 Consent Decree, NSPW has incurred and will incur significant costs that were or will be necessary and consistent with the National Contingency Plan.

80.     In fulfillment of obligations under the 2012 Consent Decree, NSPW has incurred and will incur significant costs to compensate the Trustees for natural resource damages and assessment costs for the Ashland Site.

81.     Additionally, NSPW already has incurred significant costs beyond its obligations under the 2012 Consent Decree, including but not limited to costs incurred pursuant to the 2003 AOC, that were necessary and consistent with the National Contingency Plan.

82.     To date, NSPW has paid in excess of $18 million to investigate and remediate the Ashland Site—an amount that is well in excess of its equitable share of responsibility.

83.     Moreover, the cleanup of the Ashland Facility is not complete, and substantial work remains to be done.  Consistent with the National Contingency Plan, NSPW will be spending a significant amount of money in the future to investigate and remediate the Ashland Facility.  Although the 2012 Consent Decree specifically does not address but rather reserves claims and defenses related to the Chequamegon Bay portion of the Ashland Site, NSPW has incurred and may incur additional response costs at the Chequamegon Bay portion of the

22

Ashland Site, and a declaration by this Court concerning those matters will facilitate the full and final resolution of responsibility and liability at the Ashland Site.

## FIRST CAUSE OF ACTION

### (Claim For Cost Recovery Pursuant To CERCLA § 107)

84.     NSPW realleges and incorporates by reference Paragraphs 1-83 above as if fully set forth herein.

85.     CERCLA § 107(a), 42 U.S.C. § 9607(a), imposes strict liability on (1) the owner or operator of a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated a facility at which hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise, arranged for the disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to a facility from which there is a release or a threatened release.

86.     CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), authorizes the recovery of "necessary costs of response consistent with the national contingency plan" and natural resource damages.

87.     The Ashland Facility, including each of its site-specific areas of concern discussed above, is a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

88.     The COCs are "hazardous substance[s]" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

89.     There has been an actual and/or threatened "release" at the Ashland Facility of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

**The City of Ashland**

90.    The City is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

91.    The City is a liable and responsible party for costs or damages incurred, or to be incurred, in connection with the "release" and/or threatened "release" of "hazardous substances" at the Ashland Facility pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

92.    The City is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it is and/or was at the time of COC disposal an "owner" and/or "operator" of a "facility" within the meaning of CERCLA §§ 101(9) and (20), 42 U.S.C. §§ 9601(9), (20), from which there has been a "release" and/or threatened "release" of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

93.    The City acted with the intent to arrange for the disposal of hazardous substances, resulting in the release of COC's at the Ashland Facility.  As a result, the City is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it arranged by contract, agreement, or otherwise for the disposal or treatment of hazardous substances that have contaminated the Ashland Facility.

94.    As a result of the City's release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred and paid "response costs" within the meaning of CERCLA § 101(25), 42 U.S.C. § 9601(25).  These "response costs" were necessary and consistent with the National Contingency Plan pursuant to CERCLA §§ 101(31) and 105, 42 U.S.C. §§ 9601(31), 9605.

95.    NSPW seeks reimbursement from the City, pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a), for those necessary response costs that NSPW has incurred in investigating

24

and remediating the hazardous substances that the City has released and/or disposed of to the Ashland Facility that the court does not award under CERCLA § 113(f), 42 U.S.C. § 9613(f).

**Soo Line**

96.     Soo Line is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

97.     Soo Line is a liable and responsible party for costs or damages incurred, or to be incurred, in connection with the "release" and/or threatened "release" of "hazardous substances" at the Ashland Facility pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

98.     Soo Line is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it is and/or was at the time of COC disposal an "owner" and/or "operator" of a "facility" within the meaning of CERCLA §§ 101(9) and (20), 42 U.S.C. §§ 9601(9), (20), from which there has been a "release" and/or threatened "release" of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

99.     Soo Line acted with the intent to arrange for the disposal of hazardous substances, resulting in the release of COC's at the Ashland Facility.  As a result, Soo Line is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it arranged by contract, agreement, or otherwise for the disposal or treatment of hazardous substances that have contaminated the Ashland Facility.

100.     As a result of Soo Line's release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred and paid "response costs" within the meaning of CERCLA § 101(25), 42 U.S.C. § 9601(25).  These "response costs" were necessary and consistent with the National Contingency Plan pursuant to CERCLA §§ 101(31) and 105, 42 U.S.C. §§ 9601(31), 9605.

101.    NSPW seeks reimbursement from Soo Line, pursuant to CERCLA § 107(a), 42

U.S.C. § 9607(a), for those necessary response costs that NSPW has incurred in investigating

and remediating the hazardous substances that Soo Line has released and/or disposed of to the

Ashland Facility that the court does not award under CERCLA § 113(f), 42 U.S.C. § 9613(f).

**Wisconsin Central**

102.    Wisconsin Central is a "person" within the meaning of CERCLA § 101(21), 42

U.S.C. § 9601(21).

103.    Wisconsin Central is a liable and responsible party for costs or damages incurred,

or to be incurred, in connection with the "release" and/or threatened "release" of "hazardous

substances" at the Ashland Facility pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

104.    Wisconsin Central is a liable and responsible party under CERCLA § 107(a), 42

U.S.C. § 9607(a), because it is and/or was at the time of COC disposal an "owner" and/or

"operator" of a "facility" within the meaning of CERCLA §§ 101(9) and (20), 42 U.S.C. §§

9601(9), (20), from which there has been a "release" and/or threatened "release" of "hazardous

substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

105.    As a result of the release and/or disposal of hazardous substances at the Ashland

Facility, NSPW has incurred and paid "response costs" within the meaning of CERCLA §

101(25), 42 U.S.C. § 9601(25).  These "response costs" were necessary and consistent with the

National Contingency Plan pursuant to CERCLA §§ 101(31) and 105, 42 U.S.C. §§ 9601(31),

9605.

106.    NSPW seeks reimbursement from Wisconsin Central, pursuant to CERCLA §

107(a), 42 U.S.C. § 9607(a), for those necessary response costs that NSPW has incurred in

investigating and remediating the hazardous substances that were released and/or disposed of to the Ashland Facility that the court does not award under CERCLA § 113(f), 42 U.S.C. § 9613(f).

107.    In accordance with CERCLA § 107(a), 42 U.S.C. 9607(a), NSPW is entitled to recover interest on the Ashland Facility response costs NSPW has paid.

108.    Pursuant to CERCLA § 113(l), 42 U.S.C. § 9613(l), NSPW has provided a copy of this Complaint to the Attorney General of the United States and the Administrator of the EPA. Pursuant to the 2012 Consent Decree, NSPW has also provided copies to the United States Department of Justice, EPA, and WDNR.

### SECOND CAUSE OF ACTION

### (Claim For Contribution Pursuant To CERCLA § 113)

109.    NSPW realleges and incorporates by reference Paragraphs 1-83 above as if fully set forth herein.

110.    CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1), authorizes any person to seek contribution for compelled response costs from any other person with common liability during or following any civil action under CERCLA §§ 106 or 107(a), 42 U.S.C. §§ 9606, 9607(a).

111.    The Ashland Facility, including each of its site-specific areas of concern discussed above, is a "facility" within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

112.    The COCs are "hazardous substance[s]" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

113.    There has been an actual and/or threatened "release" at the Ashland Facility of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

**The City of Ashland**

114.     The City is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

115.     The City is a liable and responsible party for costs or damages incurred, or to be incurred, in connection with the "release" and/or threatened "release" of "hazardous substances" at the Ashland Facility pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

116.     The City is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it is and/or was at the time of COC disposal an "owner" and/or "operator" of a "facility" within the meaning of CERCLA §§ 101(9) and (20), 42 U.S.C. §§ 9601(9), (20), from which there has been a "release" and/or threatened "release" of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

117.     The City acted with the intent to arrange for the disposal of hazardous substances, resulting in the release of COC's at the Ashland Facility.  As a result, the City is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it arranged by contract, agreement, or otherwise for the disposal or treatment of hazardous substances that have contaminated the Ashland Facility.

118.     As a result of the City's release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred and paid, and will continue to incur and pay, "response costs" within the meaning of CERCLA § 101(25), 42 U.S.C. § 9601(25).  These "response costs" were and will be necessary and consistent with the National Contingency Plan pursuant to CERCLA §§ 101(31) and 105, 42 U.S.C. §§ 9601(31), 9605.

119.    To the extent that the release and/or disposal of hazardous substances at the Ashland Facility resulted in injuries to natural resources, the City substantially contributed to that injury.

120.    As a result of the City's release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred costs to compensate the Trustees for alleged natural resource damages and assessment costs under CERCLA § 107(a), 42 U.S.C. § 7607(a).

**Soo Line**

121.    Soo Line is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

122.    Soo Line is a liable and responsible party for costs or damages incurred, or to be incurred, in connection with the "release" and/or threatened "release" of "hazardous substances" at the Ashland Facility pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

123.    Soo Line is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it is and/or was at the time of COC disposal an "owner" and/or "operator" of a "facility" within the meaning of CERCLA §§ 101(9) and (20), 42 U.S.C. §§ 9601(9), (20), from which there has been a "release" and/or threatened "release" of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

124.    Soo Line acted with the intent to arrange for the disposal of hazardous substances, resulting in the release of COC's at the Ashland Facility.  As a result, Soo Line is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it arranged by contract, agreement, or otherwise for the disposal or treatment of hazardous substances that have contaminated the Ashland Facility.

125.     As a result of Soo Line's release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred and paid, and will continue to incur and pay, "response costs" within the meaning of CERCLA § 101(25), 42 U.S.C. § 9601(25).  These "response costs" were and will be necessary and consistent with the National Contingency Plan pursuant to CERCLA §§ 101(31) and 105, 42 U.S.C. §§ 9601(31), 9605.

126.     To the extent that the release and/or disposal of hazardous substances at the Ashland Facility resulted in injuries to natural resources, Soo Line substantially contributed to that injury.

127.     As a result of Soo Line's release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred costs to compensate the Trustees for alleged natural resource damages and assessment costs under CERCLA § 107(a), 42 U.S.C. § 7607(a).

**Wisconsin Central**

128.     Wisconsin Central is a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

129.     Wisconsin Central is a liable and responsible party for costs or damages incurred, or to be incurred, in connection with the "release" and/or threatened "release" of "hazardous substances" at the Ashland Facility pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

130.     Wisconsin Central is a liable and responsible party under CERCLA § 107(a), 42 U.S.C. § 9607(a), because it is and/or was at the time of COC disposal an "owner" and/or "operator" of a "facility" within the meaning of CERCLA §§ 101(9) and (20), 42 U.S.C. §§ 9601(9), (20), from which there has been a "release" and/or threatened "release" of "hazardous substances" within the meaning of CERCLA §§ 101(14) and (22), 42 U.S.C. §§ 9601(14), (22).

131.    As a result of the release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred and paid, and will continue to incur and pay, "response costs" within the meaning of CERCLA § 101(25), 42 U.S.C. § 9601(25).  These "response costs" were and will be necessary and consistent with the National Contingency Plan pursuant to CERCLA §§ 101(31) and 105, 42 U.S.C. §§ 9601(31), 9605.

132.    To the extent that the release and/or disposal of hazardous substances at the Ashland Facility resulted in injuries to natural resources, Wisconsin Central substantially contributed to that injury.

133.    As a result of the release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred costs to compensate the Trustees for alleged natural resource damages and assessment costs under CERCLA § 107(a), 42 U.S.C. § 7607(a).

**Orphan Shares**

134.    As a result of insolvent, defunct or otherwise absent parties' release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred and paid, and will continue to incur and pay, "response costs" within the meaning of CERCLA § 101(25), 42 U.S.C. § 9601(25).  These "response costs" were and will be necessary and consistent with the National Contingency Plan pursuant to CERCLA §§ 101(31) and 105, 42 U.S.C. §§ 9601(31), 9605.

135.    Insolvent, defunct or otherwise absent parties' releases and/or disposal of hazardous substances at the Ashland Facility were a substantial contributing factor to injuries to natural resources under CERCLA § 101(16) at the Ashland Site.

136.    As a result of insolvent, defunct or otherwise absent parties' release and/or disposal of hazardous substances at the Ashland Facility, NSPW has incurred natural resource damages under CERCLA § 107(a), 42 U.S.C. § 7607(a).

137.    NSPW has made direct payments, and has reimbursed payments made by the United States and the State of Wisconsin, in amounts greater than NSPW's equitable share of response costs at the Ashland Facility and natural resource damages at the Ashland Site.  NSPW also has made other payments and/or incurred costs related to its in-kind services for the investigation and remediation of the Ashland Facility that are greater than NSPW's equitable share of those costs.

138.    Defendants have not expended their equitable share of response costs at the Ashland Facility or damages at the Ashland Site.

139.    NSPW seeks and is entitled to contribution from each Defendant, pursuant to CERCLA § 113(f), 42 U.S.C. § 9613(f), for those necessary response costs that NSPW has incurred and will incur in investigating and remediating the hazardous substances that each Defendant has released and/or disposed of to the Ashland Facility, which are not recoverable under CERCLA § 107(a), 42 U.S.C. § 9607(a), and the damages it has incurred in connection with the Ashland Site.

140.    NSPW seeks and is entitled to an allocation of response costs among liable parties using such equitable factors as the Court deems appropriate pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1).  NSPW requests that the Court determine the parties' proper allocable share of response costs at the Ashland Facility and damages at the Ashland Facility and determine that Defendants are liable to NSPW for those costs and damages paid by NSPW that are in excess of NSPW's equitable share and that are properly attributable to Defendants.

32

141.     NSPW seeks and is entitled to recovery or contribution for a share of response costs allocated to insolvent, defunct or otherwise absent parties who have no ability to pay and who are not otherwise affiliated with any PRP at the site ("orphan shares") among liable parties using such equitable factors as the Court deems appropriate pursuant to CERCLA § 113(f)(1), 42 U.S.C. § 9613(f)(1).  NSPW requests that the Court determine the parties' allocable share of the "orphan share" with respect to the costs at or attributable to the Ashland Facility and determine that Defendants are liable to NSPW for those costs and damages paid by NSPW that are in excess of NSPW's equitable share of the "orphan share."

142.     In accordance with CERCLA § 107(a), 42 U.S.C. 9607(a), NSPW is entitled to recover interest on the Ashland Facility response costs and compensation paid to the Trustees for natural resource damages and assessment costs at the Ashland Site that NSPW has paid and will pay in the future.

143.     Pursuant to CERCLA § 113(l), 42 U.S.C. § 9613(l), NSPW has provided a copy of this Complaint to the Attorney General of the United States and the Administrator of the EPA. Pursuant to the 2012 Consent Decree, NSPW has also provided copies to the United States Department of Justice, EPA, and WDNR.

## THIRD CAUSE OF ACTION

### (Claim For Declaratory Relief)

144.     NSPW realleges and incorporates by reference Paragraphs 1-143 above as if fully set forth herein.

145.     CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2), provides that in any action for recovery of response costs, the court shall enter a declaratory judgment on liability for response

costs or damages that will be binding in any subsequent action to recover further response costs or damages.

146.    The Declaratory Judgment Act, 22 U.S.C. § 2201 *et seq.*, provides that "[i]n a case of actual controversy within its jurisdiction . . ., any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

147.    NSPW alleges that each Defendant is liable, in whole or in part, for past and future response costs incurred by NSPW arising from the Ashland Facility.  EPA has required, is requiring, and will require NSPW to fund past response costs previously undertaken and future response costs yet to be performed at the Ashland Facilty.

148.    NSPW is informed and believes, and on that basis alleges, that each Defendant has refused to acknowledge its fair and reasonable share of past and future investigatory and response costs arising from the Ashland Facility, including without limitation, each Defendant's fair and reasonable share of the share of response costs apportioned to any "orphan" or others who may avoid statutory liability.

149.    Accordingly, there has arisen and now exists an actual controversy between NSPW and each Defendant relating to liability and responsibility for the costs at the Ashland Facility, and how such costs should be allocated.  The controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

150.    Absent a judicial declaration setting forth the parties' rights and obligations, including the appropriate allocable shares under CERCLA, a multiplicity of actions may result, and NSPW may be obligated in the future to pay costs and damages, that under CERCLA, are in fact the responsibility of each Defendant.

151.    Pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9313(g)(2), and the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-2202, NSPW is entitled to a declaration from this Court, and

requests a judgment in its favor as set forth herein.  Such a declaration would avoid the potential

for a multiplicity of actions related to future costs and effectuate a just and speedy resolution of

the issues and liabilities.

## FOURTH CAUSE OF ACTION

### (Negligence under Wisconsin State Law – Soo Line)

152.    NSPW realleges and incorporates by reference Paragraphs 1-83 above as if fully

set forth herein.

153.    Soo Line failed to exercise due care in its railway operations on the railroad right-

of-way and spur tracks located throughout Kreher Park, including but not limited to a failure to

exercise due care in loading, off-loading and transporting materials containing COCs, including

wood treatment materials, tars, oils and petroleum products.

154.    Soo Line's and/or its predecessors' railroad activities, including careless loading

and transport operations, resulted in spills, and caused, contributed to and/or exacerbated the

contamination of  the Ashland Facility.

155.    Soo Line and/or its predecessors failed to exercise due care by dumping COC-

containing substances such as tars and oils and other materials along the railroad tracks and

shoreline in Kreher Park.

156.    Soo Line's and/or its predecessors' railroad activities, including dumping in

Kreher Park, caused, contributed to and/or exacerbated the contamination of the Ashland

Facility.

157.     Soo Line knew or, in the exercise of reasonable care, should have known that, as a result of its actions described above, harmful substances, including COCs, were substantially certain to be released to the Ashland Facility, causing, contributing to and/or exacerbating damage at the Ashland Facility.  Soo Line failed to exercise due care by failing to take steps to mitigate, clean up, or stop the continuing migration of contaminants from its property to the remainder of the Ashland Facility after it knew or should have known of the existence of such contamination.

158.     As a direct and proximate result of the negligent acts and omissions described above, NSPW has incurred costs and damages for which Soo Line is liable to NSPW.

## FIFTH CAUSE OF ACTION

### (Creation of a Public Nuisance under Wisconsin State Law – Soo Line)

159.     NSPW realleges and incorporates by reference Paragraphs 1-83 above as if fully set forth herein.

160.     Through its intentional actions and/or omissions, Soo Line released and/or disposed of COCs, which EPA asserts have resulted in health hazards to humans, fish and wildlife, which has caused, contributed to and/or exacerbated these alleged hazards throughout the Ashland Facility.  Therefore, these releases amount to the creation of a public nuisance as they constitute an intentional activity or use of property that interferes substantially with the comfortable enjoyment of life, health and safety of others.

## SIXTH CAUSE OF ACTION

### (Maintenance of a Public Nuisance under Wisconsin State Law – Soo Line)

161.     NSPW realleges and incorporates by reference Paragraphs 1-83 above as if fully set forth herein.

162.     Soo Line had actual and/or constructive notice of the alleged hazards posed to human health and the environment by concentration of COCs that EPA asserts result in health hazards to humans, fish and wildlife throughout the Ashland Facility.

163.     Soo Line negligently maintained and operated the railways and failed to exercise reasonable care by, failing to take steps to mitigate, clean up, or stop the continuing migration of contaminants from its property to the remainder of the Ashland Facility after it knew or should have known of the existence of such contamination.

164.     Soo Line failed to abate the public nuisance caused by concentrations of COCs that EPA asserts result in health hazards to humans, fish and wildlife throughout the Ashland Facility.

165.     Soo Line is liable to NSPW for compensatory damages as a result of the harm suffered by NSPW due to these releases, and Soo Line must also abate the public nuisance.

### SEVENTH CAUSE OF ACTION

**(Negligence under Wisconsin State Law – Wisconsin Central)**

166.     NSPW realleges and incorporates by reference Paragraphs 1-83 above as if fully set forth herein.

167.     Wisconsin Central negligently maintained and operated the railways and failed to exercise reasonable care by, failing to take steps to mitigate, clean up, or stop the continuing migration of contaminants from its property to the remainder of the Ashland Facility after it knew or should have known of the existence of such contamination.

168.     As a direct and proximate result of the negligent acts and omissions described above, NSPW has incurred costs and damages for which Soo Line is liable to NSPW.

## EIGHTH CAUSE OF ACTION

### (Wisconsin Common Law Contribution – Soo Line and Wisconsin Central)

169.    NSPW realleges and incorporates by reference Paragraphs 1-83 above as if fully set forth herein.

170.    Soo Line created and maintained a public nuisance at the Ashland Facility.

171.    Wisconsin Central is successor to relevant liabilities of Soo Line arising out of the ownership and operation of the railroad corridor.

172.    Soo Line and Wisconsin Central's negligent actions resulted in damages or injury at the Ashland Facility.

173.    NSPW expended more than its equitable share of costs related to the damage or injury related to the presence of COCs and wood debris at the Ashland Facility caused by Soo Line.

174.    Soo Line and Wisconsin Central have not expended their equitable share of costs or damages at the Ashland Facility.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NSPW prays for judgment and relief, as follows:

a)   Against all Defendants for cost recovery, contribution, damages, and/or restitution under CERCLA for past and future response costs, including reasonable attorneys' fees, expert witness' fees, oversight costs, and interest incurred by NSPW to investigate and remediate the contamination at the Ashland Facility, in an amount to be proven at trial;

b)   Against all Defendants for compensation paid to the Trustees for alleged natural resource damages, including assessment costs, at the Ashland Site, in an amount to be proven at trial;

c)   Against all Defendants for a judicial determination under CERCLA and the federal Declaratory Judgment Act that the Defendants are liable for future response costs, including reasonable attorneys' fees, expert witness' fees, oversight costs, and interest incurred by NSPW to investigate and remediate the contamination at the Ashland Facility;

d)   Against all Defendants for costs of suit, reasonable attorneys' fees, consulting fees, expert witness fees, and other fees and expenses incurred herein;

e)   Against Wisconsin Central and/or the Soo Line for an award of compensatory damages and costs as a result of the harm suffered by NSPW as a result of the Wisconsin Central and/or the Soo Line's intentional and negligent acts, and/or any order directing Wisconsin Central and/or the Soo Line to abate the public nuisance; and

f)   Against all Defendants for such other and further relief as the Court may deem just and proper.

Dated:  August 17, 2012                    Respectfully submitted,


 s/ Ian A.J. Pitz_____
Ian A.J. Pitz
David A. Crass
Albert Bianchi, Jr.
MICHAEL BEST & FRIEDRICH LLP
One South Pinckney Street, Suite 700
Madison, WI 53703
Telephone: (608) 257-3501
Facsimile: (608) 283-2275
Email: iapitz@michaelbest.com
       dacrass@michaelbest.com
       abianchi@michaelbest.com

Mary Rose Alexander
Arthur Foerster
Margrethe Kearney
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: Mary.Rose.Alexander@lw.com
       Arthur.Foerster@lw.com
       Margrethe.Kearney@lw.com

*Attorneys for Plaintiff*
*Northern States Power Wisconsin*