IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NORTHERN STATES POWER COMPANY,

OPINION AND ORDER

Plaintiff,

12-cv-602-bbc

v.

THE CITY OF ASHLAND, WISCONSIN,
ASHLAND COUNTY, WISCONSIN and
L.E. MYERS COMPANY,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Northern States Power Company has entered into agreements with the Environmental Protection Agency to clean up a site adjacent to Lake Superior in Ashland, Wisconsin, that has been subject to long-term and significant releases of hazardous substances in violation of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601-75.  It has done much of the work and now seeks recovery and contribution for cleanup costs from defendants City of Ashland, County of Ashland and L.E. Myers Company, contending that they are also liable for releases of hazardous substances.  Now before the court are defendants' motions for summary judgment.

I conclude that the respective statutes of limitations bar plaintiff's contribution claim under § 9607 with respect to the 2003 administrative order and all its cost recovery claims

1

under § 9607.  Defendants' motion for summary judgment will be granted on that ground.

However, I am denying all defendants' motions with respect to plaintiff's remaining claims

for contribution under the 2012 consent decree.  I am also denying as moot plaintiff's

motion for leave to file a brief in surreply, dkt. #303, because the arguments in that brief

make no difference to the outcome of this case.  Finally, plaintiff has filed what it calls an

"emergency motion to exclude certain supplemental expert reports."  Dkt. #335.  In it,

plaintiff asks the court to "exclude" expert reports that defendants have served on it but that

have not been filed with the court.  Id.  Plaintiff says its request is an "emergency" because

trial is nearing.  However, plaintiff's motion is merely a motion in limine, the deadline for

which has not arrived.  Plaintiff is free to file its motions early, but defendants' response

deadline remains the same, as set forth in the amended scheduling order.  Dkt. #102.

Therefore, plaintiff's motion will be considered in the ordinary course of deciding motions

in limine.

From the parties' proposed findings of fact and the record, I find the following facts

to be undisputed.


UNDISPUTED FACTS

The property at issue is a site of approximately 40 acres adjacent to Lake Superior in

Ashland, Wisconsin.  It is, and has been, subject to CERCLA and environmental

enforcement actions from state and federal entities because it contains polycyclic aromatic

hydrocarbons and volatile organic compounds in the soils, sediment and groundwater.  (The

parties agree that these are hazardous substances under CERCLA.)  The Ashland site has four areas of concern:  (1) Chequamegon Bay; (2) Kreher Park; (3) the Upper Bluff and Filled Ravine; and (4) Copper Falls Aquifer.  Surface water flows north from the Upper Bluff and Filled Ravine area to the Kreher Park area.

### A.  Upper Bluff and L.E. Myers

From 1885 to 1947, a manufactured gas plant operated on the more inland Upper Bluff and Filled Ravine area of the Ashland site.  Ashland Light, Power & Street Railway Company owned the plant from 1896 to 1922, when Lake Superior District Power Company became the owner.  Plaintiff owns that portion of the site and gained ownership as a result of its merger with Lake Superior District Power Company in 1986.  It has never operated a gas plant there.

Defendant L.E. Myers Company is a Delaware corporation devoted to "the construction and operation of public utilities."  Between 1917 and 1922, Lewis Myers served as president and a director of defendant L.E. Myers and owned a total of 650 shares of defendant's stock out of more than 2400 issued and outstanding shares.  Plaintiff has asserted claims against defendant L.E. Myers related to its alleged operation of the gas plant from 1917 to at least 1922.

Not surprisingly, the parties lack documentation for much of what happened from 1917-1922.  Plaintiff has attempted to fill in the evidentiary blanks with newspaper articles showing that defendant L.E. Myers took action that would make it liable to plaintiff.  This

is permissible under Fed. R. Evid. 803(16).  Plaintiff has also introduced records of regularly conducted activities under Fed. R. Evid. 803(6).

On January 31, 1917, the Ashland Daily Press reported that Mr. Myers and his company were "the new owner[s]" of the "Appleyard interests in Ashland" and "will be in control of these properties."  The article also reported that defendant L.E. Myers was "one of the largest operators of light and power public utilities."

At a special board meeting on February 15, 1917, the directors of Ashland Light, Power & Street Railway Company adopted a unanimous resolution to instruct its officers to enter into a contract with defendant L.E. Myers, "covering all this company's construction work and equipment for the period of three years from February 1, 1917, including such contracts for construction materials or apparatus as have not yet been shipped either in whole or in part."  Dkt. #181, exh. #18 at 3.  On March 14, 1917, the Ashland Daily Press reported that "the local organization of the Light Company is being re-organized and developed to the high standard required by the new owners."  The article also noted that the success of Ashland Light during a snowstorm "is a practical demonstration of what the L.E. Myers company propose[s] to give in the way of service."  A March 29, 1917 article entitled "New Company Will Improve Local Service" reported that "[t]he L.E. Myers company which purchased the Appleyard interests in the Ashland Light, Power and Street Railway are showing their belief in Ashland by planning substantial improvements for their local plants."  Dkt. #219, exh. #5 at 3.

On April 12, 1917, defendant's board of directors "approved, ratified and confirmed"

4

a three-year contract dated February 1, 1917 between Ashland Light and defendant L.E. Myers, whereby defendant L.E. Myers agreed "to provide, and install supplies and apparatus, and perform labor and furnish other service, all set forth in said contract." (The parties have not located a copy of the contract itself.) On the same day, the Ashland Daily Press reported that the "new officials" of Ashland Light "made a tour of inspection of their local plants" and that "the company is planning extensive improvements to their local plants . . . and will spend several thousand dollars." Dkt. #219, exh. #6 at 3. The article noted specifically that "L.E. Meyers (sic), president of the company which bears his name and now controls Appleyard interests," and secretary L.M. Boisen were present. Id. On August 21, 1917, the Ashland Daily Press reported that Ashland Light, Power and Street Railway had begun construction of a new coal gas apparatus, and work would probably be completed in November. Dkt. #221, exh. #5. The company's 1917 and 1918 annual operating reports show that the construction included a tar extractor and condenser, and removed a washer, scrubber and boiler. Dkt. #221, exh. ##4 and 9.

On June 6, 1917, the Ashland Daily Press reported that "J.S. Donald, assistant manager of the Ashland interests of the L.E. Meyers Construction Company, has resigned" and will depart after the "arrival of General Manager Boysen [sic] from Chicago, who has charge of all the companies controlled by the L.E. Meyers [sic] Company." Dkt. #219, exh. 7 at 3.

The 1917 to 1922 editions of Brown's Directory of American Gas Companies include entries for defendant L.E. Myers in a section that is entitled "Parent or Operating

Companies" from 1917 to 1919 and "Holding and Operating Companies" from 1920 to 1922. Under the heading "Companies Operated," the directory entries for defendant L.E. Myers refer to Ashland Light. The directory does not define the term "Parent or Operating Company," "Holding and Operating Companies," or the term "Companies Operated." Between 1917 and 1922, Ashland Light's letterhead listed "L.E. Myers Co." as "managers."

Between 1917 and 1922, three individuals were officers of both defendant L.E. Myers and Ashland Light: Lewis E. Myers (president of both corporations), Lars Boisen (vice president) and William Weston (secretary and treasurer). Although Ashland Light and defendant L.E. Myers did not have identical boards of directors, Lewis Myers and Lars Boisen served as directors for both corporations between 1917 to 1922 and William Weston served as a director for both corporations from September 1919 to April 1921. Boisen appeared at an Ashland gas rate hearing on behalf of Ashland Light in 1918. Also between 1917 and 1922, F. Winders and W. Hodgkins were general managers and F. Englund was a manager of the gas department of Ashland Light. Winders had been defendant's employee (a superintendent) in 1916. At some point between 1927 and 1928, Hodgkins was both an agent and attorney for defendant L.E. Myers and vice president and a director of Lake Superior, which owned Ashland Manufactured Gas Plant at that time.

## B. Kreher Park, City and County

In the 1880s, lumber companies set up operations on the waterfront portions of the Ashland site (Kreher Park and the Bay). Around this time, the lumber companies filled in

the lake to form what are now portions of Kreher Park.  Schroeder Lumber Company owned the Kreher Park area and set up its operations there.  This area included docks for iron ore companies and railroads.  In 1939, defendant County obtained portions of the Kreher Park area as a result of Schroeder Lumber's tax delinquency.  In March 1939, the County stated that it had formed a committee to manage the property, which might include the hiring of a security guard.  In June 1939, the County filed a tax deed for the property; in November, it sought to quiet title.

The Ashland Daily Press ran a story in December 1939 about the County's sale of all buildings and "personal property" on the Schroeder Lumber site.  It also published an article in February 1940 that the Schroeder Lumber refuse burner and smokestacks had been demolished.  Also that month, the County granted an easement to Consolidated Water Power and Paper Company for use of a road across the Ashland site to the commercial dock. In May 1940, the County approved a lease of a different portion of the Schroeder Lumber property.  In February 1941, the Ashland Daily Press reported that the remaining Schroeder Lumber buildings were being razed.  Also that month, the County records show that it extended an exclusive right to purchase parts of the Schroeder Lumber property to Wisconsin Central Railway, and, in August 1941, the County issued a deed to Wisconsin Central for its former right of way at the Schroeder Lumber property.  (The parties dispute whether a wood treatment tank was among the buildings demolished.  Plaintiff argues that a June 1939 photograph shows the structure and that long time Ashland residents Gordon Parent, Ray Parent, John Sellner and Frank Kucinski gave deposition testimony that wood

treatment occurred and that the tank existed.  Defendant City argues that the deposition testimony of these declarants is inadmissible.)

On February 4, 1942, the City obtained the Kreher Park part of the site by a deed from the County.  In 1951, the City built a wastewater treatment plant on the park area, and it expanded that plant in 1971.  In 1986, the City expanded a road onto the site area and obtained additional land in the western portion of Kreher Park, this time from a local college.  Also that year, the Wisconsin Department of Natural Resources determined that portions of these properties were not city-owned because they were filled-in lake bed and thus state-owned under the state's constitution.

In 1987, plaintiff found tar on the site during excavation activities it undertook in preparation for construction.  In 1989, the City found contamination of the site when it was exploring the area to expand the wastewater treatment plant.  This plant closed in 1992, and the buildings have been taken down.  At a time when the City had an interest in the property, it conducted vehicle maintenance there.  (A City employee has stated that sometime during the City's possession of the land, it allowed the area to be used for dumping waste, but the City denies the accuracy of this statement.)  Defendant City also maintained sewer lines that introduced waste to the Ashland site.  (The parties dispute what the waste from the sewer lines actually was and whether it contributed to the contaminants of concern in the Kreher Park area.)  (Defendants City and County deny that any of these activities added to response costs or contributed to the environmental harms on the site.)

From 1994 to 2002, the Wisconsin Department of Natural Resources led efforts to

8

investigate and undertake clean up of the site.  In 1995, plaintiff began its investigations into site contamination.  Between 2000 and 2002, plaintiff excavated soil and constructed four groundwater wells to clean the soil and water onsite.  The wells and containment system removed more than 14,000 gallons of tar and 5.4 million gallons of groundwater and ran until March 2013, at a cost of approximately $2.8 million.  This work was intended to "prevent the release of PAH's [polycyclic aromatic hydrocarbons] into the Seep Area in Kreher Park, and to remove contaminated soils and install a contaminant recovery system to remove contaminants from groundwater."  Plt.'s PFOF, dkt. #299, at 21.

In 2002, the Ashland site was added to the National Priorities List, which qualifies it for federal funding for cleanup.  In 2003, the EPA took over regulation of the cleanup.  On November 14, 2003, EPA and plaintiff entered into an administrative order on consent, agreeing that plaintiff would conduct a study and complete significant cleanup of the area. Plaintiff completed the "remedial investigation/feasibility study" in 2008.  In September 2010, EPA published the "record of decision," which provides the remedy selected for the site.  In this case, EPA chose offsite (with potential for onsite) treatment of contaminated soil, sediment and groundwater.  In December 2010, EPA issued a notice of completion for the remedial investigation/feasibility study.  In 2012, plaintiff and EPA entered into a consent decree and plaintiff filed this lawsuit for contribution and cost recovery.

OPINION

A.  Statutes of Limitations

9

Defendants City and County assert that the respective statutes of limitations bar plaintiff's claims for recovery costs under § 9607 and plaintiff's contribution claims under § 9613 with respect to the 2003 administrative order on consent.  Because defendants' arguments are nearly identical, I will consider them together but will discuss the cost recovery claims and contribution claims separately.

1.  Cost recovery

Cost recovery claims under CERCLA are limited to claims for which there has been no resolution of the plaintiff's liability.  NCR Corp. v. George A. Whiting Paper Co., 768 F.3d 682, 690 (7th Cir. 2014).  In this case, plaintiff's cost recovery claims are limited to costs incurred before the 2003 administrative order on consent, which settled plaintiff's liability for the Ashland site.  Cost recovery claims must be brought "within 3 years after completion of the removal action . . . ," or, "for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action . . . ." §§ 9613(g)(2)(A)-(B).  Plaintiff filed its claims in 2012.

Plaintiff identifies two categories of costs that it incurred before the 2003 administrative order on consent.  First, plaintiff constructed soil extraction and water systems, including four wells, between 2000 and 2002, portions of which operated from 2000 until March 2013.  Second, plaintiff incurred costs starting in 1995 for investigating the contamination.  I will apply the statute of limitations analysis to these two categories of costs separately.

10

a. Soil extraction and wells

Plaintiff argues that the soil extraction and groundwater cleanup activities were "removal" actions, which means that plaintiff has three years from the date of completion of those activities to bring suit. § 9613(2)(A). In plaintiff's view, its claims are timely because the "removal action" was not complete until 2013 when plaintiff stopped operating the wells and ceased monitoring activities. Defendants dispute plaintiff's contentions on two grounds, arguing that (1) plaintiff's soil extraction and well operations were not "removal" actions but rather "remedial" actions and (2) plaintiff's activities were complete in 2002 when "[t]he soil excavation from the Seep Area in Kreher Park was completed . . . ." Dft. County's Reply Br., dkt. #298, at 9 (adopted by Defendant City, Dft. City's Reply Br., dkt. #297, at 45). Defendants argue that the excavation actions that continued after 2002 were in areas above the Kreher Park property, for which they have no responsibility. For the purposes of applying the statute of limitations, I conclude that the latter argument cuts the question too finely.

Defendants cite no authority, and I am aware of none, that distinguishes the cause of action by the units of the site. In other words, liability in CERCLA is generally divisible by contribution to harm, not by harm to a physical location on the site, so I see no reason why the statute of limitations would depend on actions taken at different physical locations on the site. United States v. P.H. Glatfelter Co., 768 F.3d 662, 674 (7th Cir. 2014) ("Where Glatfelter's argument goes astray is in its assumption that the government must

11

prove all of the elements of liability in relation to each operable unit of the Site.").

Therefore, the question is whether the action was remedial or for removal purposes.

The CERCLA statute defines both terms.  Removal refers to

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23).  Remedial actions are

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24).

The main difference between a removal and a remedial action under CERCLA is that removal actions are generally immediate or interim responses and remedial actions are generally permanent responses, an though an action that has a permanent effect may be considered a removal.  U.S. Steel Supply Inc. v. Alco Standard Corp., No. 89 C 20241, 1992 WL 229252, at *10 (N.D. Ill. Sept. 9, 1992) ("[J]ust because what would otherwise be a removal action effects a permanent remedy does not convert that response into a remedial action.").  See also United States v. W.R. Grace & Co., 429 F.3d 1224, 1244 (9th Cir. 2005) ("Courts have also stressed the immediacy of a threat in deciding whether a cleanup is a removal action.") (listing cases); Village of Milford v. K-H Holding Corp., 390 F.3d 926,

934 (6th Cir. 2004) ("We acknowledge the point that this court repeatedly has observed that removal actions are frequently short-term actions in response to an emergency.") (listing cases). In addition, the "comprehensiveness" of the response is an important factor. W.R. Grace & Co., 429 F.3d at 1245 ("[EPA guidance memorandum] instead [of permanence] uses the term 'comprehensiveness' to distinguish between the use of removal authority to conduct interim or partial response actions that are focused on immediate risk reduction as compared with a final or 'comprehensive' response at the site."). In considering these factors, courts look to whether the response measure addresses the endpoint or source of the problem, as well as the duration and completeness of the solution. New York v. Next Millenium Realty, LLC, 732 F.3d 117, 127 (2d Cir. 2013), as corrected (Oct. 16, 2013).

Defendants argue that plaintiff's response is clearly a "remedial" action under the statute, given its size and duration, its goal of removing contamination from source areas and its characterization as "remedial" in materials submitted to the state natural resources department.

The characterization of the response as "remedial" cuts both ways: it is true that the activities are called "remedial" in progress reports prepared for the state of Wisconsin (which was the lead agency on the Ashland site until 2002), but these documents also call the efforts "interim." W.R. Grace & Co., 429 F.3d at 1245 ("[R]emoval actions encompass *interim*, partial time-sensitive responses taken to counter serious threats to public health.") (emphasis added). Further, the characterization of a response as "remedial" outside the context of § 9607 liability is not dispositive. Next Millenium Realty, LLC, 732 F.3d at 130-31 ("The

district court found that the State's use of the word 'remedial' in conjunction with the GAC system and the air stripper tower showed they were remedial measures. Specifically, the State referred to these as 'interim remedial measures' and as 'remedial' alternatives in the ROD. . . . These generic uses of the word 'remedial,' however, do not require a finding that the measures were remedial in the statutory sense at the time they were implemented.").

Nevertheless, I am persuaded that the comprehensive nature of plaintiff's response activities and plaintiff's goal of permanently addressing parts of the contamination show that the activities constitute a remedial action under the statute. Plaintiff's extraction system removed more than 14,000 gallons of tar and related hazardous substances and 5.4 million gallons of groundwater over the course of thirteen years, at a cost of $2.8 million. Indeed, plaintiff built the system with the goals of removing contaminated soil and preventing groundwater from migrating away from the site or to other parts of the site. It is true that large-scale efforts may be removal actions, Next Millenium Realty, LLC, 732 F.3d at 129 (finding 23-year-long, $2.45 million project to be removal action). However, in that case there was "an 'immediate risk to public health' and the 'continued response actions' were required to 'prevent, limit, or mitigate an emergency.'" Plaintiff has not suggested that either of these concerns was present in this case. Id.

Moreover, the CERCLA statute's examples of removal actions are stop-gap, emergency efforts, such as "security fencing or other measures to limit access, provision of alternative water supplies [and] temporary evacuation and housing of threatened individuals not otherwise provided for." § 9601(23). On the other hand, the statute provides that "the

14

term ['remedial'] includes, but is not limited to, such *actions at the location of the release* as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, *cleanup of released hazardous substances and associated contaminated materials*, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or *excavations*, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies."   § 9601(24) (emphasis added).  See also Morrison Enterprises, LLC v. Dravo Corp., 638 F.3d 594, 608 (8th Cir. 2011) (concluding that 25-year-long project to replace contaminated drinking wells with new ones was remedial project); Minnesota ex rel. North Pacific Center, Inc. v. BNSF Railway Co., 686 F.3d 567, 574 (8th Cir. 2012) (interpreting Minnesota law modeled after CERCLA and concluding that "projects undertaken by the Center were done to redevelop the property rather than to mitigate a threat to public health or the environment" and thus were remedial).  Further, the statute defines as remediation, response activities that "prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment," id., which was precisely the goal of plaintiff's response.

Because I conclude that plaintiff's response is a "remedial" action under the statute, the six-year statute of limitations applies, starting from the time construction began on the project.  Although plaintiff broke ground for different phases of the project at different times, it has no basis on which to assert that construction was not complete before 2006 (six years before plaintiff filed suit).  Accordingly, I conclude that plaintiff's claim for cost

15

recovery under § 9607 with respect to the soil extraction and groundwater clean-up project is time-barred.

b.  Investigation

Plaintiff asserts that the costs for investigating the site before the 2003 administrative order on consent should be considered removal actions for which it can recover costs under § 9607.  It is true that investigative and monitoring costs are recoverable as removal costs, § 9601(23), but this argument is of no help to plaintiff's case.

The statute of limitations for removal actions is three years from the completion of the project.  § 9613(g)(2)(A).  Plaintiff argues that the 2003 administrative order continued its previous investigations, so the work was not "completed" until the record of decision was issued in September 2010.  Plt.'s Br., dkt. #224, at 32-33 ("The investigative costs that NSPW incurred prior to 2003 were part of a continuing removal action at the Site that culminated with the EPA supervised RI/FS. . . .  An RI/FS, a removal action, is not considered complete until at least the issuance of the Record of Decision ('ROD') by EPA.").  However, plaintiff has not argued that the action it took pursuant to the 2003 administrative order was merely a "removal" action, and it does not follow why the investigations (removal actions) would "continue" as a portion of a project that is "remedial" in nature.  Thus, unless plaintiff is prepared to argue that the pre-2003 investigations and the 2003 administrative order activities were both removal actions, the two activities are treated separately under the statutes of limitations.  Plaintiff has not suggested that it

16

intends to make such an argument. The investigations are "completed" when they cease, which in this case was sometime before the settlement order was entered. After the entry of the order, any further investigations are part of the administrative order project and come under plaintiff's § 9613 contribution claim.

This conclusion is bolstered by <u>Bernstein v. Bankert</u>, 733 F.3d 190, 206 (7th Cir. 2012), in which the Court of Appeals for the Seventh Circuit held that with respect to each type of cost, plaintiff is limited to one recovery, under either § 9607 or § 9713. All of plaintiff's costs with respect to the 2003 administrative order are limited to contribution under § 9613. Costs such as the investigative costs arising before the 2003 administrative order are response costs recoverable under § 9607. They are subject to a three-year statute of limitations period, starting at the completion of the project, if they are removal actions, or subject to a six-year statute of limitations period, starting at the time of construction, for remedial actions. Plaintiff's investigative costs arising under § 9607 necessarily ended in 2003, when the costs become subject to the administrative order and to § 9613. To hold otherwise would be to treat the investigative costs as a category of costs subject to both § 9607 and § 9613, which the statutes prohibit.

Thus, even if there is overlap in subject matter with respect to the investigations and the actions under the 2003 administrative order, plaintiff's cost recovery claim under § 9607 accrued when plaintiff completed those investigations. If the investigation cost is not included in the § 9613 claim, then it must have been completed before plaintiff entered into the 2003 administrative order. Thus, the statute of limitations began to run in 2003.

17

Because plaintiff did not file its claims until 2012, these costs are time-barred and not recoverable.

2.  Contribution under the 2003 administrative order

Defendants say that plaintiff's contribution claim is time-barred with respect to the costs from the 2003 administrative order on consent.  Under § 9613(g)(3), plaintiffs must bring their contribution claims within three years of "the date of judgment . . . or the date of an administrative order under section 9622(g) of this title (relating to *de minimis* settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages."  Plaintiff argues that orders requiring future expenditures relating to the response do not constitute "actions under § 9622(h)," which permit agencies tasked with enforcing CERCLA the authority to "settle a claim under section 9607 of this title for costs *incurred* by the United States Government," id.  (emphasis added), but the cases plaintiff cites to support this argument are not on point. However, defendants cite Peoples Gas Light & Coke Co. v. Beazer E., Inc., No. 14 C 2434, 2014 WL 4414537, at *4 (N.D. Ill. Sept. 8, 2014), which held that the "administrative settlement and order on consent" fell under § 9622(h) because it was both a "*settlement* and an administrative order on consent" and because it "include[d] a settlement for the recovery of response costs."  Id. (emphasis added).  The parties do not discuss the requirement that § 9622(h) settlements involve government costs, so I have not considered that issue. Nevertheless, the parties agree that the 2003 administrative order pertained to future

18

response costs only and did not *recover* or *settle* costs already *incurred* by the government. Because I conclude that the 2003 administrative order in this case did not settle already-incurred costs, I conclude that it was not issued pursuant to § 9622(h).

The Court of Appeals for the Seventh Circuit has held that in instances like this, when the administrative order is not one listed in § 9613(g), the statute does not provide a limitations period but that either the limitations period under § 9613(g)(2) or § 9613(g)(3) would apply. Bernstein, 733 F.3d at 207. Although in Bernstein, the court declined to decide which limitation period applied, other courts have held that the statute of limitations on actions similar in nature should be controlling. Hobart Corp. v. Waste Management of Ohio, Inc., 758 F.3d 757, 772 (6th Cir. 2014) ("It is well known that Congress frequently leaves a void in federal statutory law related to limitations periods, and when that happens, the Supreme Court 'do[es] not ordinarily assume that Congress intended that there be no time limit on actions at all.' Instead, the Court 'borrows the most suitable statute or other rule of timeliness from some other source.'") (citations omitted); Peoples Gas Light & Coke Co., 2014 WL 4414537, at *4 (citing Hobart Corp. approvingly). In Hobart Corp., 758 F.3d at 775, the court concluded that even if § 9622(h) did not apply, the court would have applied the three-year statute of limitations normally applied to § 9622(h) contribution claims because claims under § 9622(a) are similar and because § 9613(g)(3) governs all contribution actions. Id. ("Here, § [9613](g)(3)(B) itself provides the most analogous triggering event. It starts the limitations clock for contribution actions related to administrative agreements under § [9622](g) and (h) on the date when the

settlements become effective.  It is only logical that the effective date of the ASAOC—a settlement agreement entered into under § [9622](a)—would be the most analogous triggering event in this case.").

I agree that § 9622(h) and its applicable limitations period of § 9613(g)(3) are most analogous to the § 9622(a) administrative order in this case.  Both § 9622(h) orders and § 9622(a) orders arise under "contribution" actions governed by § 9613.  Moreover, the issuance of the order ought to have been an event that triggered plaintiff's efforts to find potentially responsible parties for contribution to its response efforts.  It stands to reason that parties wait until they break ground or complete the projects to sue for recovery because such response actions are voluntary.  With respect to other actions, such as administrative orders that direct a response action and set out costs for cleanup, it follows that parties may bring contribution claims upon issuance of the order and need not wait until construction begins or is completed.  Therefore, I conclude that plaintiff's claims are time-barred with respect to the 2003 administrative order because plaintiff  waited until well after 2006 to bring its claims.

### B.  Defendant L.E. Myers

"CERCLA imposes a 'pay-first, split-the-bill-later' regime, [and] . . . [a]nyone who paid [for cleanup] can then recover contribution from other responsible parties in accordance with that entity's equitable share of the costs."  NCR Corp., 768 F.3d at 686.  Plaintiff is seeking contribution under § 9613(f) of CERCLA toward its cleanup costs for the Ashland

site from each defendant.

Contribution is a two-step analysis.  In this case, the first step is determining whether defendant L.E. Myers is a "covered person" under 42 U.S.C. § 9607; the second step is determining how to allocate the costs among the responsible parties.  Environmental Transportation Systems, Inc. v. ENSCO, Inc., 969 F.2d 503, 506 (7th Cir. 1992).  Section 9607(a) of the Act lists four different categories of potentially responsible parties, one of which is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed."  § 9607(a)(2).

Plaintiff contends that defendant L.E. Myers is liable for cleanup costs at the Ashland site because it "operated" Ashland Manufactured Gas Plant between 1917 and at least 1922.  In its motion for summary judgment, defendant L.E. Myers argues that plaintiff has not adduced sufficient evidence showing that defendant's involvement with the gas plant during this period made it an "operator" under the statute.

CERCLA provides a circular definition of "operator," defining it as "any person . . . operating . . . a facility."  42 U.S.C. § 9601(20)(A)(iii).  "Facility" is broadly defined as any place "where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).  Recognizing that courts were struggling to define what actions constituted the "operation" of a facility, particularly in the context of parent and subsidiary corporations, the United States Supreme Court provided the following guidance in United States v. Bestfoods, 524 U.S. 51, 66-67 (1998):

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for

> purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

This holding is central to the parties' dispute in this case.

Reading the passage from <u>Bestfoods</u> as a whole, defendant L.E. Myers contends that in order to avoid summary judgment, plaintiff must present sufficient evidence that defendant managed, directed or conducted operations at the Ashland manufactured gas plant specifically related to the leakage or disposal of hazardous waste.  Plaintiff disagrees, arguing that the two statements have distinct meanings:  (1) one operates a facility simply by managing, directing or conducting its affairs; and (2) in the context of a parent corporation operating a subsidiary, the parent is an operator only if the operation relates to pollution. Under plaintiff's theory, if it can show that defendant L.E. Myers managed, directed or conducted the affairs of the gas plant, it need not show that those activities were related to pollution.  Neither <u>Bestfoods</u> nor subsequent federal cases support plaintiff's interpretation of the operator standard.

In <u>Bestfoods</u>, the Supreme Court initially discussed a parent corporation's derivative liability for the conduct of a subsidiary, concluding that such claims are governed by the corporate law principle that the parent is not liable unless the plaintiff demonstrates a basis for piercing the corporate veil.  524 U.S. at 61-64.  The Court then discussed situations in which a corporation would be *directly* liable as an operator under CERCLA and made clear that direct liability requires proof that the corporation performed activities related to

22

pollution at the polluting facility and did not merely oversee the general operations of a subsidiary.  Id. at 64-70 ("'The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary.'").  The Court distinguished "acts of direct operation that give rise to parental liability" from "interference that stems from the normal relationship between parent and subsidiary."  Id. at 71.  It noted that activities consistent with the parent's investor status, such as supervising finance and capital budget decisions and articulating general policies, should not give rise to direct liability.  Id. at 72.  However, the Court found that the corporate parent's involvement in the environmental matters of its subsidiary's chemical facility was enough to raise an issue with respect to the parent's liability under CERCLA's operator provision.  Id.  Therefore, what mattered was defendant's involvement with the operation of the facility itself and whether that involvement was sufficiently related to the resulting pollution.  The Court never suggested that the standard would change if there were no parent-subsidiary relationship.

Courts addressing the issue after Bestfoods have reached similar conclusions, requiring that operations of a facility must be related to the pollution that occurred there.  Citing Bestfoods and several federal appellate cases, the Court of Appeals for the Seventh Circuit has found that if the president and principal shareholder of a corporation "did not merely direct the general operations of [the facilities] or specific operations unrelated to pollution . . . but supervised the day-to-day operations of the landfill—for example, negotiating waste-dumping contracts with the owners of the wastes or directing where the wastes were

23

to be dumped or designing or directing measures for preventing toxic substances in the wastes from leeching into the ground and thence into the groundwater—then he would be deemed the operator, jointly with his companies, of the site itself."   Browning-Ferris Industries of Illinois, Inc. v. Ter Maat, 195 F.3d 953, 956 (7th Cir. 1999) (citing Bestfoods, 524 U.S. at 66-67; United States v. Township of Brighton, 153 F.3d 307, 313-15 (6th Cir. 1998); Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 937 (8th Cir. 1995); Witco Corp. v. Beekhuis, 38 F.3d 682, 692 (3d Cir. 1994); FMC Corp. v. Aero Industries, Inc., 998 F.2d 842, 846 (10th Cir. 1993); United States v. Northeastern Pharmaceutical & Chemical Co., 810 F.2d 726, 743 (7th Cir. 1986)).

All of the cases cited in Browning required evidence that the defendant's activities at the facility in question were related to the pollution at the facility, regardless whether a subsidiary was involved.  E.g., Township of Brighton, 153 F.3d at 315-16 ("The township was not operating at arm's length with a contractor.   Rather, it made repeated and substantial ad hoc appropriations, and it made arrangements . . . for bulldozing and other maintenance . . .  It also took responsibility for ameliorating the unacceptable condition of the dump."); Control Data Corp., 53 F.3d at 937 ("CERCLA imposes operator liability when a person has 'authority to determine when hazardous wastes [will] be disposed of and to determine the method of disposal, . . . and actually exercises that authority, either by personally performing the tasks necessary to dispose of the hazardous wastes or by directing others to perform those tasks.'").

In sum, an entity is liable as an operator if it manages, directs or conducts the affairs

24

of a facility and those actions are related in some way to the pollution.  United States v. Saporito, 684 F. Supp. 2d 1043, 1055 (N.D. Ill. 2010) ("[A] jury could also find that the evidence shows that . . . Defendant managed, directed, or conducted operations related to pollution, and was, therefore, an 'operator' under CERCLA"); City of Waukegan, Illinois v. National Gypsum Co., 560 F. Supp. 2d 636, 641 (N.D. Ill. 2008) ("[A]n operator is . . . specifically, someone who manages, directs, or conducts operations that are related to the alleged release of hazardous waste or decisions about compliance with environmental regulations."); RSR Corp. v. Avanti Development Inc., 2000 WL 1448705, at *8 (S.D. Ind. Mar. 31, 2000) ("[B]ecause RSR directed the workings of, or managed, the cleanup activities at a 'site or area where a hazardous substance [had] been deposited,' at a time when the hazardous substance was disposed of, it can be held liable for a portion of the cleanup costs.").  Without more, overseeing the general finances or operations of the facility or sharing directors or officers is not enough to impose CERCLA operator liability.  Bestfoods, 524 U.S. at 72; United States v. Sterling Centrecorp Inc., 960 F. Supp. 2d 1025, 1050 (E.D. Cal. 2013) (defendant liable because its "pervasive control and management" over the facility "exceeded actions typically associated with a parent's investor status"); National Gypsum, 560 F. Supp. 2d at 641 ("Mere oversight is insufficient.").  Therefore, regardless whether defendant L.E. Myers may be characterized as a parent corporation of Ashland Light, if it  managed, directed or conducted operations that were related to the release of hazardous waste at the gas plant, it may be held liable.

It is clear from the undisputed facts that defendant L.E. Myers shared officers and

directors with Ashland Light and held itself out as an operator and manager of Ashland Light's plants. Although these facts alone would not subject defendant L.E. Myers to operator liability under CERCLA, plaintiff has adduced evidence that defendant L.E. Myers entered into a three-year contract with Ashland Light to make improvements to its facility. Newspaper articles show that those improvements included constructing a new coal gas apparatus, adding a tar extractor and condenser and removing a washer, scrubber and boiler. Defendant's expert, Kurt Herman, has expressed the opinion that "[t]hese construction activities, particularly the addition of the tar extractor and condenser, would have necessarily involved subsurface work and excavation of soils in areas that are contaminated. In fact, it would have been virtually impossible to perform any sort of new gas plant construction, particularly construction involving excavation, that did not involve pollution. Such construction also would have had to comply with the City's ordinance related to the discharging of wastewater from the Ashland MGP." Herman Decl., dkt. #242, at ¶ 18. Although this evidence is not conclusive, it suggests at this stage of the proceedings that defendant L.E. Myers performed work at the Ashland Manufactured Gas Plant that had a connection to the pollution that occurred there.

Summary judgment is not appropriate because defendant L.E. Myers has failed to show that no issue of material fact exists and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Accordingly, I will deny defendant's motion for summary judgment and allow plaintiff to proceed to trial on its claim that defendant L.E. Myers operated Ashland Manufactured Gas Plant.

## C.  Defendant County

Plaintiff also asserts a claim for contribution against defendant County.  The County argues that it is not a "covered person" under § 9607 because it was neither an "owner or operator" of the Ashland site nor an "arranger" of hazardous waste disposal.  §§ 9607(a)(2)-(3).  The first question to address is whether defendant County was an owner of the Kreher Park area at the Ashland site.

### 1.  Ownership

Defendant County argues that it was never truly the owner of the Kreher Park area because the land consists of fill from the bed of Lake Superior and, under state and federal law, the state retains ownership of the lake bed.  State v. Trudeau, 139 Wis. 2d 91, 105, 408 N.W.2d 337 (1987) ("As of the date of statehood, Wisconsin obtained absolute title to the beds of navigable waters like Lake Superior. . . .  "); Mendota Club v. Anderson, 101 Wis. 479, 78 N.W. 185, 189 (1899) ("The tax deed to Treadway, therefore, . . .  in so far as it covers, or purports to cover, portions of the lake, must be regarded as unauthorized, contrary to the statute, and hence void.").  If the party doing the filling stands to benefit when the lake bed is filled in artificially, the state retains ownership.  De Simone v. Kramer, 252 N.W.2d 653, 657 (Wis. 1977) ("Thus if the fill area in question is the product of accretion, title to the accreted soil vest[s] in the riparian owner . . . who [i]s free to convey the same . . . ." but holding that riparian sellers would not have title if they introduce fill and that title with artificial fill is available only when third party non-seller is cause).  Although defendant

27

County did not do the filling, the lumber mill owners who preceded it in title did so; thus, defendant County argues, none of the parties in that chain of title ever had true ownership of the filled in land.

As an initial point, defendant County's argument is confusing: first, it admits ownership of the land, dft. County's PFOF, dkt. #168, at ¶ 61; then in its initial brief it argues that the fact that it was never the true owner of the land should be a factor in allocation (rather than as a means by which to determine liability).  Dft. County's Br., dkt. #166, at 24 ("Courts sometimes use a party's status as the owner of the property being remediated as a factor in allocating costs.").  Nevertheless, plaintiff treats the argument as one under liability in its opposition brief and defendant County continues down that path in its reply brief.  No matter whether I consider this issue under liability or as a factor for allocation, I conclude that plaintiff has adduced sufficient evidence at this stage of the proceedings to show that defendant County is an "owner" under CERCLA.

An "owner" under CERCLA is not limited to the entity with legal title over the property.  Commander Oil Corp. v. Barlo Equipment Corp., 215 F.3d 321, 330 (2d Cir. 2000) ("Certain lessees may have the requisite indicia of ownership vis-à-vis the record owner to be de facto owners and therefore strictly liable.").  Owners may include those with interests less than ownership but who act like owners and do things that an owner would or could do, such as making decisions about managing the property without consulting the real owner.  Id. at 331.  Courts consider to what extent the entity in question retains "the bundle of rights that comes with ownership of property."  Id. at 332.  In Commander Oil, the court

28

noted several that could be important, "specifically: (1) whether the lease is for an extensive term and admits of no rights in the owner/lessor to determine how the property is used; (2) whether the lease cannot be terminated by the owner before it expires by its terms; (3) whether the lessee has the right to sublet all or some of the property without notifying the owner; (4) whether the lessee is responsible for payment of all taxes, assessments, insurance, and operation and maintenance costs; and (5) whether the lessee is responsible for making all structural and other repairs." Id. at 330. See also City of Waukegan, Illinois v. National Gypsum Co., 587 F. Supp. 2d at 1003 (defendant found to be owner under CERCLA because "[t]he lease also required National Gypsum to pay taxes on the property, permitted assignment and subletting, allowed National Gypsum to make changes and improvements to the leased property . . . and required National Gypsum to maintain the leased property at its own expense.").

Defendant County is particularly well suited for classification as an "owner" because it maintained so many of the attributes of ownership. It was the owner of the property for at least the time period of 1939 to 1942; indeed, it believed it was the owner. It purported to sell portions of the land to railroad companies and the "personal property" of the buildings and other fixtures back to Schroeder Lumber and it also granted easements and leased part of the property during its tenure. Further, the County's meeting minutes show that it developed a committee to manage the Kreher Park area, discussed hiring a security guard to protect the property and ordered the demolition of buildings in Kreher Park. Defendant County makes much of the fact that the entity held liable in Commander Oil,

215 F.3d at 321, was a lessee of the property and that it was not a lessee of Ashland, but a leasehold is relevant only to the extent it endows the lessee with ownership-like status.  I conclude that even if the County never gained legal title over the property, plaintiff has adduced sufficient evidence of the County's  de facto ownership of the land for the time period of 1939 to 1942 to survive summary judgment.

Defendant County also argues that it is exempted from ownership status because under the statute, "[t]he term 'owner or operator' does not include a unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment, or other circumstances in which the government involuntarily acquires title by virtue of its function as sovereign."  § 9601(20)(D).  It is undisputed that defendant County gained its interest in the property as a result of Schroeder Lumber's tax delinquency.  However, "[t]he exclusion provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility."  Id.  Therefore, the next question is whether defendant County played any role in a release of hazardous substances.


2.  Release

Under CERCLA, "[t]he term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant). . . . "

30

§ 9601(22).  Disposal means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." § 6903(3); § 9601(29).

Defendant County argues that nothing in the record shows that it caused or contributed to such release or disposal.  It says that its budgets from 1940 to 1942 do not show any revenue from the lumber mill and that the mill was not operated during that time.  Plaintiff argues that regardless whether defendant County ever operated the mill, it contributed to the release of hazardous materials.   Specifically, plaintiff argues that defendant County was responsible for releases of hazardous substances when defendant County stored abandoned or potentially dismantled wood treatment chemicals in a tank from the old Schroeder Lumber Company and played a role in demolishing the refuse burner and smokestacks in February 1940 and other mill buildings sometime after February 1941.

a.  Wood treatment

Defendant County says that there is no proof that the wood treatment tank existed when it took ownership of the property.  Plaintiff cites several pieces of evidence in support of the proposition that wood treatment occurred on the land and that the tank was present during the County's ownership.  First, Schroeder Lumber's articles of incorporation state that it manufactured wood preservation chemicals and owned wood preservation plants.  However, it is not clear that such activities actually took place on the Ashland site.  Plaintiff

31

also relies on a 1939 photograph of the site as evidence that a tank existed; defendant County disputes what the photograph shows.  However, defendant County admitted that the wood treatment chemical creosote has been disposed of at the site and that wood preservation activities occurred there at some time.  Finally, plaintiff has several eyewitness reports from long time Ashland residents who say that wood treatment activities occurred on the Ashland site during the time the County owned the land.

Defendant County contends that the residents' affidavits and depositions are inadmissible as hearsay because the deponents are deceased and defendant County was not present at the depositions.  Fed. R. Evid. 802 (testimony of unavailable declarant admissible only if it "(A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and (B) is now offered against a party who had—or, in a civil case, whose predecessor in interest had—an opportunity and similar motive to develop it by direct, cross-, or redirect examination.").  Although the railroad defendants were present, I cannot conclude that those defendants had the same motivation to cross examine the witnesses with respect to the issue of wood treatment, which is what is required to exempt the deposition testimony from the prohibition on hearsay testimony.  Ikerd v. Lapworth, 435 F.2d 197, 205 (7th Cir. 1970) ("Although it is generally the rule that a deposition is not admissible as to one not having the opportunity to be represented at its taking, the presence of an adversary with the same motive to cross-examine the deponent and identity of issues in the case in which the deposition was taken with the one in which it is sought to be used provide a well-recognized exception to the rule.").

32

Plaintiff points out that its experts relied on this evidence, but this is irrelevant. An expert's reliance on another source cannot serve as a basis to prove a fact that was the subject of testimony from that source. Matter of James Wilson Associates, 965 F.2d 160, 173 (7th Cir. 1992) ("The fact that inadmissible evidence is the (permissible) premise of the expert's opinion does not make that evidence admissible for other purposes, purposes independent of the opinion. If for example the expert witness (call him A) bases his opinion in part on a fact (call it X) that the party's lawyer told him, the lawyer cannot in closing argument tell the jury, 'See, we proved X through our expert witness, A.'") (citation omitted); Engebretsen v. Fairchild Aircraft Corp., 21 F.3d 721, 728 (6th Cir. 1994) ("Rules 702 and 703 do not, however, permit the admission of materials, relied on by an expert witness, for the truth of the matters they contain if the materials are otherwise inadmissible.").

Although no one piece of this evidence proves that the *County* abandoned wood treatment chemicals at the site, together, this evidence is sufficient to avoid summary judgment. It is plausible that Schroeder Lumber left wood treatment chemicals onsite in 1939 and that the County failed to properly dispose of those chemicals. At trial, of course, plaintiff will have to prove that it is more probable than not that disposal occurred while the County had ownership over the Ashland site and that the County caused or contributed to that disposal.

Even if wood treatment did not occur at the Ashland site, plaintiff asserts that defendant County was responsible for releasing hazardous materials when a refuse burner, smokestacks and other buildings were demolished onsite.

b.  Demolition

Defendant County argues that it cannot be held responsible for the demolition of the smokestacks and other buildings because it did not own them and played no part in their demolition.  Specifically, defendant County says that it sold the buildings back to Schroeder Lumber no later than December 11, 1939, when the Ashland Daily Press ran an article stating that "The John Schroeder Lumber Co. personal property on the bay front was today sold by Ashland county to the Schroeder company for $8,000, but the county retained possession of the land on which the property is located . . . . " Foerster Decl., dkt. #229, exh. #45.  The article went on to say that the County "sold to the Schroeder company all of the buildings, improvements, machinery, tools and property on the premises with the exception of the piling and other subsurface [illegible]." Id.

Plaintiff argues that even if this transaction took place and even if defendant County was not directly responsible for the demolition that caused disposal, it can be held liable because liability for owners under CERCLA is strict and the County owned the underlying land at a time of disposal.  It is true that the general rule is that owners can be held liable even if they did not cause the disposal if they owned the land at the time of disposal.  42 U.S.C. § 9607 (a covered person is "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of").  See also Crofton Ventures Limited Partnership v. G & H Partnership, 258 F.3d 292, 299 (4th Cir. 2001) ("It is irrelevant under the Act that Crofton could not prove who actually dumped the TCE at the site or whether any owner or operator had knowledge of the

34

dumping or leaking during the relevant period [because defendant owned site at time of disposal].").

In making this argument, however, plaintiff is not taking into account the law that prevents an involuntary sovereign purchaser such as defendant County from being held liable unless it "cause[d] or contribute[d]" to the release. § 9601(20)(D); cf. Delaney v. Town of Carmel, 55 F. Supp. 2d 237, 249 (S.D.N.Y. 1999) ("There is absolutely no dispute that Putnam took whatever interest it has or may have had in the land in a tax delinquency foreclosure sale that occurred long after the disposal of the allegedly hazardous substances. To the extent that Putnam took paper title to the Site, it did so in the guise of a secured creditor and nothing more; there is no relationship whatever between its ownership interest and the disposal activities at the site. Thus, Putnam is not an 'owner' of the Site for CERCLA purposes.").

Nevertheless, some facts suggest that defendant County played a direct role in the demolition and release of hazardous substances. The County admits that its March 1939 meeting minutes state that it established a management committee charged in part with determining how to dispose of the mill structures, plt.'s PFOF dkt. #299, at ¶ 83, and that the County ordered that the mill property be "salvage[d] . . . at once." Id. at ¶ 86. These facts suggest that the County played a direct role in the razing of the lumber mill buildings. Therefore, the question is whether the razing of the buildings constituted a release of hazardous substances.

According to an Ashland Daily Press article from February 1940, "Observers to the

demolition reported that after the fall of the refuse burner 'rose dust and soot, a forty-four year accumulation.'" Foerster Decl., dkt. #229, exh. #46.  Plaintiff's experts have said that "the dust and soot released from the demolished refuse burner contained PAHs [polycylic aromatic hydrocarbons] that subsequently settled into the sediment and surrounding soils." Plt.'s PFOF, dkt. #299, at ¶ 111.  Defendant County disputes this opinion, arguing that the experts cannot know for sure whether polycyclic aromatic hydrocarbons came from wood smoke because they did not "fingerprint" it.  Defendant County does not explain what it means by "fingerprinting."   To the extent it means that the harm is divisible and that plaintiff must distinguish the polycyclic aromatic hydrocarbons allegedly released by the smokestacks from those allegedly released by the gas plant, the law is to the contrary.  P.H. Glatfelter Co., 768 F.3d at 675 ("[T]he burden to prove divisibility rests on the defendant.").  See also PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 177 (4th Cir. 2013) ("To be sure, PCS presented no *direct* evidence that Holcombe and Fair moved or dispersed any contaminated soils.  However, 'CERCLA does not require a smoking gun.'") (emphasis in original) (quoting  Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc., 596 F.3d 112, 136 (2d Cir. 2010)).

Finally, plaintiff argues that it is undisputed that polycyclic aromatic hydrocarbons and other contaminants were present in the soil of the Kreher Park area as of 1939, when defendant County took possession of the property and that the demolition of the buildings was a "disposal" because it disturbed those contaminants.  Indeed, "[u]nder CERCLA, 'disposal' includes dispersion of hazardous materials which exacerbates a pre-existing

contamination on the property." City of Gary v. Shafer, 2009 U.S. Dist. LEXIS 47113, 40 (N.D. Ind. June 2, 2009). See also Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1510 (11th Cir. 1996) ("Viewed in this fashion, we do not read CERCLA's definition of 'disposal' as being limited to instances where a hazardous substance is initially introduced into the environment at a facility. . . .  Rather, CERCLA's definition of 'disposal' should be read broadly to include the subsequent movement and dispersal of hazardous substances within a facility.") (citation omitted); Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp., 976 F.2d 1338, 1342 (9th Cir. 1992) ("Catellus alleges that Ferry excavated the tainted soil, moved it away from the excavation site, and spread it over uncontaminated portions of the property.  These allegations are sufficient to support its claim that Ferry disposed of a hazardous substance as the term "disposed of" is used in 42 U.S.C. § 9607(a)(2).").

Because I conclude that plaintiff has adduced sufficient evidence at this stage that defendant County is an owner under § 9607, that is, that defendant County had an ownership interest in the Kreher Park site and it may have been responsible for the release of pollutants, I need not determine whether defendant County could also be considered an "arranger" under § 9607.

## D.  Defendant City

Defendant City has moved for summary judgment on the equitable allocation of contribution to the clean up costs under § 9613(f).  Id.  Defendant City argues that equity

weighs so greatly in its favor that the court may allocate it 0% contribution costs. It has not moved for summary judgment with respect to whether it is a "covered person" under § 9607.

Under § 9613(f), "the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Courts have often relied on six factors called the "Gore factors" (because Congressman Albert Gore proposed them originally as part of an amendment to the 1980 House Superfund bill that did not pass. Environmental Transportation Systems, Inc. v. ENSCO, Inc., 969 F.2d 503, 508 (7th Cir. 1992)): (1) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with federal, state or local officials to prevent any harm to the public health or the environment. Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 326 n.4 (7th Cir. 1994). The court should consider any other factors that are relevant and appropriate. Id. at 326 ("Factors which may be considered include the relative fault of the parties . . . ; relevant 'Gore factors,'. . . ; and any contracts between the parties bearing on the allocation of cleanup costs. . . . ") (citations omitted).

Defendant City argues that its case may be decided primarily upon the fact that

plaintiff has no evidence that its actions caused any measurable increase in the costs of clean up. Further, defendant City argues that various other factors weigh in its favor as well. For its part, plaintiff says it does have evidence of harm from defendant City's activities and that the other factors do not weigh in favor of defendant City.

Defendant City devotes most of its brief to the argument that its activities on the Ashland site either contributed nothing to the contamination or contributed so little that the additional cost to plaintiff in cleanup is too small to calculate. Plaintiff argues that the City added to the contamination of the site by (1) dumping "unsuitable materials" on the site, Foerster Decl., dkt. #229, exh. #11; (2) moving and grading contaminated soil when the City constructed a wastewater treatment plant in 1951, id., expanding the wastewater plant in 1971, id., and extending a road from 1986-87 on the Ashland site, id.; (3) pumping contaminated water from the wastewater plant construction site into the Bay, Peterson Dep., dkt. #206 at 42:21-43:3; (4) maintaining a sewage line that dumped sanitation waste onsite, Shields Decl., dkt. #237, at 4-5,; and (5) performing vehicle maintenance on the site, Wosepka Dep., dkt. #211, at 111:21-113:17.

Defendant City admits the vehicle maintenance, but denies that oil leaked as a result. It also disputes its employee's 2009 statement that the City dumped waste at the site, but this statement is admissible as a statement by a party opponent. Fed. R. Evid. 801(d)(2). With respect to plaintiff's allegations about pumping water into the Bay and about the sewage line, defendant City says that plaintiff has not proved the extent of contamination related to these activities but does not deny that some contamination may have occurred.

39

(Plaintiff also says there was "urban runoff" from the City but does not explain the difference between this allegation and its sewer allegation.)  At the very least, a genuine dispute of fact remains about the kind and amount of contaminants the City may have added to the Ashland site.

Next, although defendant City disputes plaintiff's characterization of the wastewater plant construction and expansion in various ways, it concedes that it completed this construction on the site when the soils there already contained polycyclic aromatic hydrocarbons and other hazardous substances.  Construction alone may constitute disposal under CERLCA in such circumstances.  PCS Nitrogen Inc., 714 F.3d at 177-78 ("The district court heard evidence showing that Holcombe and Fair engaged in extensive grading and construction that affected at least 27.9% of the site during their ownership, and that even superficial earth-moving activities such as grading can redistribute contaminated soils.  Considering the evidence of widespread contamination across the site, the court's inference that Holcombe and Fair's construction activities at some point effected a disposal is certainly plausible."); Kaiser Aluminum & Chemical Corp., 976 F.2d at 1342.

Defendant City says that even if any of these activities contributed to contamination, plaintiff has not shown the quantity of that contribution or that defendant City's alleged releases increased the cost of responding in any measurable way.  Defendant City contends that even when a party contributes to the contamination but its actions cause only a negligible effect on the total cost of cleanup, that party may be relieved from cost contribution all together.  PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 616 (7th Cir.

40

1998) ("PMC's spills may have been too inconsequential to affect the cost of cleaning up significantly, and in that event a zero allocation to PMC would be appropriate.").  Plaintiff's experts have said only that they either have not performed the analysis necessary to determine such response costs or that the City increased the costs, without saying by how much or under what analysis the expert reached that conclusion.

Plaintiff is not required to quantify defendant City's contribution to the cleanup costs to show either liability or contribution.  Environmental Transportation Systems, Inc., 969 F.2d at 509 ("However, we support the district court's statement to the extent that it construes section 9613(f) as not requiring courts to adopt pro rata assessments of contribution once a party is determined to be liable under CERCLA."); United States v. Alcan Aluminum Corp., 315 F.3d 179, 184 (2d Cir. 2003) ("The government is not required to show that a specific defendant's waste caused the incurrence of cleanup costs in order for strict liability to attach to that defendant."); Kalamazoo River Study Group. v. Menasha Corp., 228 F.3d 648, 655-56 (6th Cir. 2000) ("[O]ther circuits have held that § [9607] does not require a plaintiff to show any direct causal link between the waste each defendant sent to the site and the environmental harm. . . .  The district court's imposition of a requirement that plaintiffs in contribution actions show causation in order to establish a defendant's liability was erroneous.  The liability standard for contribution claims is the same as the standard for cost recovery claims."); Axel Johnson, Inc. v. Carroll Carolina Oil Co., 191 F.3d 409, 414 (4th Cir. 1999); Control Data Corp., 53 F.3d at 935 ("At the outset, we note that CERCLA does not require the plaintiff to prove that the defendant caused actual harm to

the environment at the liability stage. . . .  Harm to the environment is material only when allocating responsibility.") (citation omitted).

Nevertheless, with respect to allocation of contribution costs, courts have given significant weight to the amount of disposal and contamination caused by the defendant. Agere Systems, Inc. v. Advanced Environmental Technology Corp., 602 F.3d 204, 236 (3d Cir. 2010) ("[T]here was nothing wrong with its choosing to use volume, rather than the dollar value of the settlements, as the basis for allocating liability among the parties."); Environmental Transportation Systems, Inc., 969 F.2d at 508 ("[C]ourts should equitably allocate costs of cleanup according to the relative culpability of the parties rather than an automatic equal shares rule."); Control Data Corp., 53 F.3d at 936 ("[I]n the allocation phase, harm to the environment and care on the part of the parties plays a more substantial role.").

Defendant City contends that its small role in environmental harm along with the other factors it discusses are sufficient to support a finding of zero allocation.  First, it says that its ability to pay is much less than plaintiff's; plaintiff points to the City's insurance as a reason to disregard this argument.  Defendant City also points to its management of the Kreher Park property for public benefit, its cooperation with state and local government in site cleanup, the burden on the City from the long-term cleanup efforts because the site is not available for economic development and the fact the City never had valid title of the property because it was filled-in lake bed and therefore owned by the state.  Plaintiff argues that the City should be allocated costs related to releases made by Schroeder Lumber because

the entity is an "orphan," but the City argues this is unfair, especially given its status as a public entity.  In addition, defendant City points to reasons that plaintiff should be allocated all of the cleanup costs:  plaintiff benefited from owning the gas plant and the gas plant released the majority of the hazardous substances at the Ashland site.  Finally, defendant City argues that remediation of the site is not a benefit for which it might be allocated costs.

I agree that most of these points are relevant factors to consider in contribution.  In particular, allocation of responsibility to the City for the Schroeder Lumber contamination appears inequitable, and the disproportionate nature of contamination between the City and plaintiff is reason to allocate the City a smaller portion of response costs.  Nevertheless, I conclude that at this stage of the litigation, the factors do not show that defendant City should have no responsibility for cleanup costs.  That the City may not have had valid title to the land appears irrelevant considering that the allocation factors are equitable in nature and that defendant City exercised control of the site as an owner would have.  Moreover, other factors, such as the parties' cooperation with cleanup efforts, are disputed by the parties, and some factors, such as the City's ability to pay, cut both ways.  Ashley II of Charleston, LLC v. PCS Nitrogen, Inc., 791 F. Supp. 2d 431, 491 (D.S.C. 2011) aff'd, 714 F.3d 161 (4th Cir. 2013) (availability of insurance may be reason not to consider inability to pay in allocating costs).

Most important, a finding of zero liability is reserved for cases in which the culpability of a covered party is extremely lopsided and is best determined after consideration of all the facts.  Environmental Transportation Systems, Inc., 969 F.2d at

509-10 ("Because allocation of cleanup costs can be based on many equitable factors on which there may be much competing evidence leading to material issues of fact, the issue of contribution may not always be suited to disposition by summary judgment."); PMC, Inc., 151 F.3d at 616 (concluding after bench trial that plaintiff should be allocated no costs because contribution to harm "inconsequential"). Indeed, arriving at such a conclusion at summary judgment would require a court to hold that, considering the facts in the light most favorable to plaintiff, the court can conclude that the defendant's role was so insignificant that it should pay nothing at all. I agree that the facts tend to show that defendant City's activities likely caused only a small portion of the environmental harm at the Ashland site and that the City has made a strong argument for a modest allocation. Nevertheless, even a small portion may be allocated to a contributing party under § 9613, City of Gary v. Shafer, No. 2:07-CV-56-PRC, 2011 WL 3439239, at *2 (N.D. Ind. Aug. 5, 2011) (court allocated 0.24% of costs), and I am not prepared to conclude at this point that defendant City should contribute nothing.

Accordingly, I do not conclude that defendant City should be allocated zero costs for cleaning up the Ashland site, and its motion will be denied. Niagara Mohawk Power Corp., 596 F.3d at 136 ("U.S. Steel was an owner of the property in question; there is evidence in the form of expert testimony, albeit disputed, that U.S. Steel caused hazardous deposits on the property. CERCLA does not require a smoking gun. The credibility of the experts, the type of evidence presented, the amount of hazardous waste involved, and the degree of U.S. Steel's involvement in the identified hazardous deposits are all relevant as equitable factors

44

for the district court to use in apportioning response costs.  At this stage, however, NiMo's claims against U.S. Steel survive summary judgment . . .").

ORDER

IT IS ORDERED that

1.  Defendant City of Ashland's motion for summary judgment, dkt. #147, and defendant Ashland County's motion for summary judgment, dkt. #165, are GRANTED with respect to plaintiff Northern States Power Company's cost recovery claims under 42 U.S.C. § 9607 and contribution claim under § 9613 for the 2003 administrative order on consent and DENIED as to plaintiff's remaining claim under § 9613 for the 2012 consent decree.

2.  Defendant L.E. Myers Company's motion for summary judgment, dkt. #174, is DENIED.

3.  Plaintiff Northern States Power Company's motion for leave to file a brief in surreply to defendants' motions for summary judgment, dkt. #335, is DENIED as moot.

4.  Defendants shall have until April 2, 2015 to respond to plaintiff's "emergency motion to exclude certain supplemental expert reports."  Dkt. #335.

Entered this 18th day of March, 2015.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge

45