IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NORTHERN STATES POWER COMPANY,

                OPINION AND ORDER
     Plaintiff,

                 12-cv-602-bbc

    v.

THE CITY OF ASHLAND, WISCONSIN,
and ASHLAND COUNTY, WISCONSIN,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

From 1885 until 1947, a manufactured gas plant operated in Ashland, Wisconsin, on a bluff above Lake Superior, generating gas for heating and lighting. For that entire time, the plant discharged tar wastes into the bluff. In 1987, plaintiff Northern States Power Company acquired the plant site and shortly thereafter discovered contamination. It notified the Wisconsin Department of Natural Resources, which began an investigation of the site in 1994.

In 2002, the entire site, which includes the bluff on which the plant stood, the land below the bluff, known generally as Kreher Park, Chequamegon Bay of Lake Superior and the deepwater in the Copper Falls aquifer underlying the site, was added to the National Priorities List and the Environmental Protection Agency took over the state's work. Ten years later, the agency entered into a consent decree with plaintiff, which agreed to remediate the site.

Now plaintiff is pursuing claims against defendants City of Ashland and Ashland County for contribution to the costs of the cleanup under 42 U.S.C. § 9613.  Although plaintiff has accepted responsibility for the remediation of the Upper Bluff, it denies that the discharges are the sole source or even the major source of the contamination that has been found in Kreher Park and in Lake Superior's Chequamegon Bay.  Instead, plaintiff contends that both Ashland County and the City of Ashland bear responsibility for all or most of the contamination below the bluff.

As to defendant Ashland County, plaintiff alleges that in the three years from 1939 to 1942 in which it owned the area, it failed to clean up the wood treating chemicals left by the former owner, Schroeder Lumber Company, leaving these chemicals to sink into the ground and eventually create a waste pond.  In addition, plaintiff alleges that while the County owned the land, it demolished the company's smokestacks and refuse burner, adding contaminants to the soil.  As to the City of Ashland, plaintiff alleges that this defendant has owned the land since 1942 and that it too failed to clean up the wood treating chemical waste.  In addition, plaintiff alleges, the City dispersed contaminants through construction projects in the area, drained the waste dump into the bay, sanctioned the dumping of refuse and the changing of oil for city vehicles and built a city sewer through the park that emptied into the bay.  Plaintiff's claims are asserted under the Comprehensive Environmental Response, Compensation, and Liability Act, or CERCLA, 42 U.S.C. §§ 9601-75.

From the evidence adduced during the eight-day trial to the court, I find that defendant County is not covered under CERCLA and cannot be held liable for any hazardous

2

substances in the land below the bluff or in the bay.  Although the County gained title to the Schroeder Company property after the company failed to pay its property taxes in the 1930s, it did so only as a result of the company's tax delinquency and it did not cause or contribute to the release or threatened release of hazardous substances from the facility.

Unlike the County, defendant City has potential liability under CERCLA because it operated Kreher Park.  However, plaintiff has not shown that the City was responsible for the addition of any hazardous substances to the site.  At most, it may have dispersed some of the existing contamination discharged from the manufactured gas plant.  Even assuming that it did, the equitable allocation of response costs is a discretionary decision for the court to make, taking into consideration such factors as the relative contributions of hazardous waste, the plaintiff's settlements with other parties, the defendant's level of voluntary cooperation with the cleanup efforts, the extent of the parties' financial resources and the benefit of the cleanup to the potential contributor.  In this case, the factors bearing on that determination weigh in the City's favor and support an allocation of 0%.

For the purpose of deciding this case, I find the following facts from the evidence adduced at trial.

## FACTS

### A. Background

Plaintiff Northern States Power first discovered tar waste in the bluff when it began construction work on the plant site in 1987, after acquiring the site through merger of its

3

subsidiary, NSP-Wisconsin, with Lake Superior District Power.  Two years later, the City of Ashland discovered soil contamination in Kreher Park, a city park that lies between the bluff and Chequamegon Bay.  (It is not clear whether the boundaries of the park and the area beneath the bluff and within the remediation area are congruent, but because it makes no difference to the outcome of the case, I will assume they are.)  The park occupies a portion of an area that was open water in the 1880's and now lies on a substratum of wood waste dumped into the bay by the lumber companies that lined the shoreline in the late 1880s and early 1900s.

In 1994, when the Wisconsin Department of Natural Resources began investigating the site and undertaking cleanup efforts, it discovered that the contamination of the site was more widespread than it had previously believed, with the principal contamination being two substances.  The first was polycyclic aromatic hydrocarbons or PAHs, a category of chemicals often found together in groups of two or more.  They "are created when products like coal, oil, gas and garbage are burned but the burning process is not complete."  Polycyclic Aromatic Hydrocarbons(PAHs)Fact Sheet, EPA, Jan. 2008.  The other was non-aqueous phase liquids, or NAPLS.  Non-aqueous phase liquids are either *light* non-aqueous phase liquids, that is, one of a group of organic substances, including petroleum chemicals, that are relatively insoluble in water but less dense than water, whereas *dense* non-aqueous phase liquids are also relatively insoluble in water but are denser than water and tend not to mix with it. http://toxics.usgs.gov/definitions/napls.html, visited Sept. 9, 2015).  In 2002, the site was added to the National Priorities List, qualifying it for federal funding for cleanup activities.

With this action, the Environmental Protection Agency took over the state's work, entering into an agreement with plaintiff for a study and significant cleanup of the site.

In 2012, plaintiff entered into a consent decree with the EPA covering the remediation of the site. Plaintiff then brought suit against the City of Ashland, Ashland County, two railroads that operated at the base of the bluff at one time (the Soo Line Railroad and the Wisconsin Central Railroad, Ltd.), and L.E. Myers Company (which allegedly played a role in the operation of the manufactured gas plant between 1917 and 1922), in an effort to obtain contribution from other potentially responsible parties for the anticipated costs of restoring Kreher Park and Chequamegon Bay. Plaintiff asserted claims under both state law and CERCLA for contribution, cost recovery, declaratory relief and damages. Both railroads settled with plaintiff before trial and L. E. Myers reached a settlement shortly after the start of trial. The state law claims were asserted only against the railroads, leaving only CERCLA claims against the City and County.

## B. The Site

The site at issue covers about 40 acres of land in the city and county of Ashland, along the southern shore of Chequamegon Bay. For remedial and investigative purposes, the site has been divided into four parts, referred to by the government agencies as "areas of concern": (1) the soils and groundwater of the Upper Bluff, which is where the manufactured gas plant was located; (2) the Kreher Park soils and shallow groundwater; (3) the sediments in the bay; and (4) deep groundwater in the Copper Falls Aquifer underlying the site. Only the first three

areas play any part in this case.



The manufactured gas plant was built on the Upper Bluff in 1885, with about one-fifth of the plant straddling a ravine that ran down to the bay.  Within the next few years, the ravine was filled in completely with a mix of materials, including the nearly impenetrable native soil known as "Miller Creek."  (The exact date in which the ravine was filled completely is unknown.  All of the witnesses on the subject and the EPA agree that it was filled by the early 1900s.)

In 1885, the Ashland area was riding a short-lived economic boom fueled by the harvesting and sale of timber from Wisconsin's extensive forests of eastern white pine. Lumber companies had established sites at the harbor and rafts and ships were plying the lake with cargoes of harvest timber and lumber products.  Railroads moved in and built tracks along the base of the bluff, running in a generally east-west direction along the waterfront.

Within a short time, the waterfront became so full of timber waste that it could support buildings.  From 1901 until the early 1930s, the John Schroeder Lumber Company owned and

occupied a good part of the area at the base of the bluff below the gas plant.  It stopped

processing lumber sometime around 1930; in 1939, it lost any remaining ownership rights it

had in the land when it failed to pay its property taxes and the property reverted to defendant

Ashland County.

In 1942, the City took over the County's ownership rights in the area, which is now

called Kreher Park.  In 1951, it began construction of a wastewater treatment plant in the

northeastern part of the park area.  It expanded the facility in the early 1970s and considered

further expansion in 1989 until early explorations of the expansion site disclosed

contaminated soil and groundwater.  The City notified the Wisconsin Department of Natural

Resources and began building a new plant a few miles away.

## C. The Manufactured Gas Plant

### 1. Gas production

During the 62 years that the manufactured gas plant was operating, it used three

different processes to manufacture gas, starting with the Patton Process, which vaporized

naphtha oil.  In 1899, the plant switched to a carbureted water-gas process and used it until

1947, when it stopped manufacturing gas altogether.  For a short period around 1917, the

plant also used a coal gasification process that did not use petroleum for carburization.

Manufacturers of gas employ large "holders," both for containing the gas before it is

sent out to customers and for relief purposes when the production exceeds immediate demand.

The Ashland gas plant began with one relief holder, known as Holder No. 1, which was used

7

in the original Patton Process and possibly in the initial period of the carbureted water-gas process. At some time, that first holder was replaced by a second holder, No. 2, that was used as a production holder for the early years of carbureted water-gas production until it too was replaced by two new holders, Nos. 3 and 4, which were used until production ended at the site. Also on site at one time or another were tanks for storing gas oil (a heavier version of crude oil) and naphtha. The naphtha tanks were built above ground at first, but were replaced by underground tanks at some time before 1923.

Each of the gas holders had a metal superstructure on the outside. Within this superstructure, a structure resembling an inverted cup moved up and down over the gas as it was produced and then released. A water tank on the bottom formed a water seal so that the gas did not escape, but rode up and down with the inverted cup structure.

In producing carbureted water-gas, the plant operators started with a gas that was enriched with a petroleum product, put it through a superheater to insure that the added petroleum vapor would stay in vapor form and then sent the gas through a "washbox," which took out about 30 percent of the tar from the gas stream. From there, the gas continued into a "relief holder," after which a variety of condensers and tar extractors took the remainder of the tar out of the gas stream in preparation for the production holder. At this point, very little tar remained in the gas, as shown by the near absence of contamination in the ground that has been excavated under holder no. 4, which was used as a production holder.

So long as the plant was in operation, the washbox and relief holder would have released tars and wastewater. The relief holder alone would have accumulated about 70% of

8

the tars from the process, all of which had to overflow at some point. Although the plant had a tar well on site by 1923, it, too, would have overflowed regularly as fluids were added to it. Inevitably, tar wastes overflowed into the ravine, unencapsulated, or later, in pipes, after 1902, when the city enacted an ordinance requiring gas plant waste to be discharged only through underground sewers.

The precise nature of the emulsions and of the tar changed, depending on the feedstock. If, for example, anthracite coal was used as the carbon source, the composition of the tars and waste products would be different from the composition of the waste produced by bituminous coal. Other differences would result if the company used naphtha, gas oil or heavier oils. Records from approximately 1908 to 1947 show that changes in the BTU value of the gas during the time period, indicating changes in the materials used.

To meet the requirements of the 1902 city ordinance, the manufactured gas plant installed vitrified clay tiles in various diameters for discharge of tar waste into the ravine. These clay pipes were made of pieces joined end-to-end in a simple friction fit for use in conveying drainage or waste.

During the entire period in which it operated, the gas company submitted annual reports to the Wisconsin Public Service Commission and to the Railroad Commission. The reports showed that the gas plant produced approximately 1.4 billion cubic feet of gas over its lifetime. This level of production would have generated 700,000 to 1,000,000 gallons of tar and tar emulsions. During this same period, the company reported selling about 126,400 gallons of tar and using 11,200 gallons of tar for boiler fuel. In addition, as of early 2014,

9

14,000 gallons of tar had been recovered from the Copper Falls Aquifer.  If these 151,600 gallons of known tar releases are subtracted from the amount generated over the years, approximately 450,000 to 840,000 gallons of tar releases are unaccounted for, without counting the 1.5 to 3 millions gallons of wastewater containing tar emulsions that would have had to go somewhere.

Neither the company's own records nor those of the two commissions with which the company filed annual reports show that the plant ever engaged in tar sales of any size. Nothing in any record indicates that the gas plant had the equipment that would be expected to be found in a plant that was undertaking significant tar recovery for resale, such s a separator, tar dehydrator or other tar handling equipment.

2. Excavation findings

During the excavation of the Upper Bluff, investigators found a number of the vitrified clay tiles within the gas plant site, in the filled ravine and running east and west along the base of the bluff where they would have been connected to an open ditch running to the bay. Many of these clay pipes discharged tar and tar emulsions directly to the ravine.  From there, the waste would have migrated down to Kreher Park, which is more than 20 feet lower in elevation than the gas plant site.

During excavations in 2014, investigators found black viscous, tarry material within many of the clay pipes, one of which was a 12-inch diameter pipe at the very bottom of the ravine, running under St. Claire Street (an east-west street located at the base of the bluff).

10

As the investigators encountered the pipes and broke them open, tar flowed out, demonstrating its continuing mobility in the environment. Originally, the 12-inch pipe was connected to an east-west pipe that carried the tar and other waste to an open ditch ending at the bay, but the connection failed between the two pipes at some time, presumably before 1939, when the open ditch was filled in. The loss of the connection allowed the direct discharge of the 12-inch pipe into the wood fill material in the old lake bed that is now the park. Some of the tar continues to migrate through Kreher Park out toward the bay through the wood fill.

The excavations revealed three different pathways from the gas plant: (1) before 1902, the tar flowed down through the ravine under the gas plant and into bay; (2) in 1902, after the city enacted its ordinance on waste discharges, the plant began discharging its tar waste through clay tile pipes down through the filled ravine, then along the base of the bluff to the west to the open ditch that took the waste out into the bay; and (3) after the east-west pipes clogged up, the tar waste flowed through the filled ravine in clay tiles into the wood waste area and into the seep.

The relatively impermeable clay-rich, reddish-colored soil in the Ashland area has protected the Copper Falls Aquifer underlying the remediation site by not allowing downward movement of the contaminants in that area. However, the relatively loose materials that filled the ravine allowed tar to travel down the ravine and eventually into the wood waste underlying Kreher Park, which allowed the tar to spread underground.

The 2014 excavations of the gas plant site uncovered a tarry mass that had been in gas

11

holder No. 2 at the plant site.  Other tar samples were obtained from the area in which the plant had been located, near the boiler house and the coal carbonization location (nearly 100 years after the coal carbonization experiment had ended at the gas plant) and from the bottom of gas holder No. 1, which went out of service in the early 1900s.  Sampling of other pipes in the Upper Bluff showed similar tarry material.

Excavations in 2002 revealed wood slab and wood debris under an area known as the seep, which lies at the base of the bluff and extends in a generally northward direction toward a waste tar dump.  The excavations also unearthed very black, tarry material that was determined to be carbureted water gas waste, as were all other samples taken from this area.

In 2005, an investigation of the waste tar dump area showed that contaminated wood waste was present in the dump area.  The contamination in the park flowed below the fill material in the ravine and through the waste wood layer, which varies in depth from 2 feet to 17 feet below the surface.

## D. The Schroeder Lumber Company

### 1. The site

In 1901, the John Schroeder Lumber Company, a Milwaukee corporation, purchased an existing mill on the waterfront in what is now Kreher Park and set up operations.  It produced wooden building products, shingles, boards, pilings, railroad ties and timber for framing and received and shipped lumber by rail.

As the depression took hold in 1930-31, shipments of lumber into the Ashland harbor

ceased entirely and Schroeder Lumber neither received nor sent out lumber shipments.  In 1936, the Ashland Daily Press reported that the mill had been closed for almost six years and that the Schroeder docks were being dismantled.

2. Wood treating activity at Schroeder Lumber

The Schroeder Lumber Company's 1920 Amended Articles of Incorporation stated that one of the corporation's purposes was to "manufacture and deal in preservative chemicals," but the evidence does not show that the company had a wood treating facility or wood treating equipment at its Ashland site for which it would have needed preservative chemicals.  No such facility or equipment is shown in either of the two existing historical aerial photographs of the lumber company site, one of which was taken between 1920 and 1925, and the second, in June 1939.  Neither photograph shows any structure that would have been used in wood treatment, such as a boiler for heating the oil, tanks for the mixture of chemicals, an open tank filled with treating chemicals for immersing wood products or stacks of treated railroad ties or other wood products.  No such structure was ever mentioned in Sanborn insurance maps of the site.  ("[Sanborn] maps were designed to assist fire insurance agents in determining the degree of hazard associated with a particular property and therefore show the size, shape, and construction of dwellings, commercial buildings, and factories as well as fire walls, locations of windows and doors, sprinkler systems, and types of roofs." (http://www.loc.gov/rr/geogmap/sanborn/, visited Sept. 9, 2015).  The 1909 Sanborn maps describe the area that plaintiff alleges was used for wood treatment as "filled ground,"

13

"scattered lathe piles," "shingles" and "wood piles." The 1923 and 1936 Sanborn maps do not show any wood treating equipment or structures, such as tanks for wood treating chemicals, hoists or drying platforms.

Nevertheless, two of plaintiff's experts, Walter Shields, a specialist in the reconstruction of historical contamination at industrial sites, and James Ebert, a forensic scientist, testified that such a facility could have existed. Each said that the 1939 photograph showed a "dark rectangle" near the mill that he thought was the size and shape of a wood-treating tank, with lighter-colored ground in the same area, suggesting a loss of vegetation in the area that might been the result of leakage of the wood-treating chemicals. Tr. trans., dkt. #536, 2-A-37; dkt. #549, 3-A-121-22. However, the Wisconsin Department of Natural Resources used ground-penetrating radar to look for the remnants of structures on the Schroeder Lumber site, along with electronic resistivity, which quantifies how strongly a given material opposes the flow of electronic current, and other tests. The department found no evidence of any contaminants other than curbureted water-gas tar and distillate oils, the same contaminants attributable to the gas plant discharges.

The primary trade association for companies engaged in wood preservation, the American Wood-Preserver's Association, published annual lists of wood-treating plants, but never listed the Schroeder Lumber plant in Ashland. A publication of the association's annual proceedings includes maps and tables that indicate the location of wood treating plants in the United States dating back to 1899. None of these list Schroeder Lumber as a wood treater in Ashland.

Schroeder never advertised wood treatment as being available in Ashland. Its 1915 list of lumber prices did not include any treated wood products. The Ashland City Directory did not list Schroeder Lumber in the classification of wood-treater. No records have been found showing any sale of treated wood products from Schroeder Lumber to a third party, any purchases of wood-treating chemicals by Schroeder Lumber or any purchase of wood tar for treating purposes. The company produced railroad ties, but did not advertise them as dipped. (This is not surprising; according to the American Wood Preservers Association's 1928 report, 99.95% of all railroad ties were pressure treated rather than dipped.) The Minneapolis, St. Paul and Sault St. Marie Railroad ran through Ashland and could have purchased railroad ties from Schroeder had they been available, but the railroad purchased its treated railroad ties from a facility in New Brighton, Minnesota.

In 1909, the lumber mill suffered a large fire. (Neither plaintiff nor the EPA has identified soot or wood from this fire as contaminants of concern on the site.). In its coverage of the fire, The Ashland Daily Press made no mention of any potential loss of wood treating facilities or danger from wood treating chemicals. In 1911 and 1912, Schroeder Lumber representatives made a detailed report of the mill's assets to the City of Ashland Board of Review. The report listed such items as postage stamps and one blind horse, along with planing and saw mills, but said nothing about any wood treatment facilities or chemicals. In 1939, when the county was negotiating with Schroeder Lumber over the sale of most of the property on the premises, it prepared an inventory that did not include any equipment typically used in connection with a wood treating operation.

Defendants' expert, Eugene Wengert, testified about the kind of equipment that would be required for wood treating, such as chemical storage tanks, a connection to the electrical generator to heat the chemicals in the tank, a handling system for getting the wood out of the tank and onto railroad cars, an incising machine for putting holes into the wood to allow the chemicals to penetrate, a place to cut the tie down to the right length and an "S iron" to produce a big piece of metal in the shape of an S to be pounded into the ends of the ties to prevent them from splitting. Wengert saw no evidence of any equipment of this kind, with the exception of a timber saw that could be used to cut ties to the right length. In his opinion, the climate in Ashland did not suggest that a lumber company would want to treat wood there because the wet and cold climate would extend the process for drying the wood before it could be treated.

When asked about the particular area in the lumber yard that others had thought might be the site of the treating tank, Wengert said it would be "a pretty terrible location in many respects," tr. trans., dkt. #553, at 7-P-92. The area was crowded; the tank would have been near the conveyor; and the proximity of the tank and conveyor would have made it more difficult to load the lumber onto rail cars. Also, it would not have been safe to build a conveyor carrying lumber close to wood treating chemicals, which are flammable.

Plaintiff's expert, Thomas Beck, a person with extensive experience in the forest products industry, was unable to say where a wood treating tank might have been located on the Schroeder site. He testified that neither the cold temperatures nor moist climate of Ashland would be a hindrance to wood treating, as defendant's witness had testified, because

16

wood treating goes on in the state of Washington and it too has a moist climate.  It was Beck's opinion that Schroeder did treat wood, but he based this on three possible factors, not actual ones: (1) the company had a motivation to treat wood to increase its sales and profits; (2) the industry recognized the advantages of open tank treating at the time; and (3) wood treating would have been consistent with the company's operations, because the company made products that could have been treated.  Beck never saw any photographs of a wood treating operation at Schroeder and he had no evidence that any railroad was purchasing railroad ties that had been hand-dipped rather than pressure-treated at the time Schroeder was in operation.

Neither the Wisconsin Department of Natural Resources nor the EPA has found any evidence of wood treating at the former Schroeder Lumber Company site in Ashland.

### E. Ashland County

When the Schroeder Lumber Company failed to pay any property taxes between at least 1931 and 1938, Ashland County filed a tax deed for the property in June 1939.  After some court proceedings, Schroeder reached an agreement with the County in November 1939 that allowed the company to buy all the property on the premises, including a refuse burner, retaining for the county the land, all docks, pilings and subsurface materials.  In return, the company paid the county $8000 and signed a quitclaim deed to the real property, docks, etc., in December 1939.  The County held the land until about 1942, when it turned over the title to the City.  During that time, neither the County nor anyone else operated the mill or the

refuse burner.

At some time before February 1940, Schroeder Lumber Company sold the lumber mill's refuse burner to Ben Mistroll of the Chicago Tubing and Metals Company of Ashland, which arranged for its demolition that month. About a year after the refuse burner was demolished, the remaining Schroeder buildings on the site were razed by a local firm. The County had no role in the demolition of the buildings, burner or smokestacks it had sold back to Schroeder Lumber. The agencies investigating the Ashland site have not discovered any evidence that the demolition caused any increase in the cost of the remedy required at the site. The refuse burner powered the boilers at the lumber yard; it did not produce wood tar.


F.  City of Ashland

1. The wastewater treatment plant in Kreher Park

In 1951, the City of Ashland built a wastewater treatment facility in Kreher Park on the former Schroeder Lumber property, in close proximity to Chequamegon Bay. It enlarged the facility in the early 1970s, after the Wisconsin Department of Natural Resources advised it that improvements were necessary to prevent the inflow of lake water into the facility and the discharge of effluent that had received only primary treatment.

Greeley & Hansen, a Chicago engineering firm specializing in municipal wastewater treatment plants, developed the plans for the treatment plant's initial construction and for its expansion. Before construction of the original plant began, during construction and again before construction began for the expansion, the engineers took soil borings from the area in

18

which the construction was to take place.  None of these borings disclosed any tar, oil or petroleum substance.  According to Ronald Bizzarri, a Greeley & Hansen employee who worked on the pre-construction plan for the plant expansion, an encounter with any tar, oil or petroleum substance "would have been significant" and "would certainly have been noted." Bizzarri dep., dkt. #126, at 113, 115.  Bizzarri was not aware of any contemporaneous report of oil, petroleum, tar or similar product that was excavated or moved about during the 1970 expansion, id. at 117.  It was his experience that "if contractors run into substances of that sort [oil, petroleum or tar], they would stop work and wait for direction from the owner as to how to handle that material." Id. at 117-188.  He observed that contractors did this regularly. In fact, their contracts provided extra compensation "because of the difficulties that would be caused by trying to deal with" such substances.  Id. at 117.   The engineers involved in the planning for the wastewater plant were aware of the waste tar dump and had aligned the facility's influent pumps to avoid it.  Id. at 112.

Much of the construction of the treatment plant and its expansion took place below water level and required the contractors to construct walls to prevent water from flowing in or out of the plant into the lake while the soils were being dewatered. In the original construction, the walls were clay core.  They rose above the lake level and rested on the hard clay subsurface under the wood waste and other "unsuitable materials" in the lake bed, such as decayed wood, organic material, topsoil and other earth that would not support the weight of the new construction.  For the second round of construction in the 1970s, the contractor built a wall of steel sheeting to enclose the excavation for the new tank area and provide a dry

area in which to construct the new additions to the plant. Until that wall was completed, on at least 89 days, lake water came into the excavation area and had to be removed, along with plant effluent, that is, water that had received primary treatment. On one occasion, an existing pipe broke during construction and for less than one day, sewage flowed into the lake before the flow could be re-routed to the other influent pipe. Gerulat dep., dkt. #132, at 116-17. Daily reports prepared during this time made no reference to encounters with any tar or oily substances. Id. at 158. Throughout the expansion work, the director of the wastewater treatment plant took regular water quality samples of lake water near the construction site and never notified the resident engineer of any discharges of pollutants. Id. at 158-61.

Although the City moved its treatment plant off site in the early 1990s, because soil borings showed encroaching contamination, testing conducted in 2014-15 by one of the City's expert witnesses, Robert Karls, showed no contamination at the treatment plant site itself. Moreover, Karls took samples of the water that had accumulated in the basement of the abandoned wastewater treatment plant after the city turned off the sump pumps that had been removing accumulated water from the basement. Testing of the samples showed no detectable contaminants in the water.

### 2. The open ditch

Excavations and Sanborn maps show that an open ditch ran in a generally north-south from the base of the bluff to the bay during the first part of the twentieth century, but was not in evidence by 1939. Discharges from the manufactured gas plant ran through this ditch into

the bay, until the 12-inch clay pipe running from the gas plant lost its connection to the east-west pipes leading to the ditch, presumably before 1939. The location of the ditch suggests that it was built to bypass the Schroeder Lumber Company to avoid staining any lumber products. Plaintiff introduced no evidence that during the time the ditch existed the City or the County or any private company other than the gas plant ever used it to discharge any waste products. It appears to have been sited so as to avoid the Schroeder Lumber Company work area to avoid the possibility of staining the company's lumber products.

3. The city's sewer system

The City's sanitary sewer system never discharged through the park, as confirmed in a 1949 report from Greeley & Hansen, which shows no sanitary sewer discharging through the site between its eastern boundary, Prentice Street, and its western boundary, Ellis Street. The system was never connected to the 12-inch clay pipe installed by the manufactured gas plant to run down the base of the ravine. Such a connection would not have been possible in the absence of a lift station because the clay pipe was 11 feet below the elevation of the sewer and no one has ever found any evidence of a lift station in that area or of any connection between the sewer and any other clay pipe originating at the gas plant. The City did construct a lift station for the sewer system, but it did so for other purposes. The sewer was connected to the gas plant for roof water runoff, but was never intended to take tar waste from the plant.

Neither the construction of the sewer system nor later repairs in Kreher Park contributed to the need for remediation. Workers involved in the lift construction or the

21

sewer repairs did not move any soil, but replaced it in the construction holes and tests of the areas have shown an absence of any contaminants.

4. Waste and refuse dumping and oil changes

Although the City tolerated allowed the dumping of refuse and waste within the park for some years, no investigator has ever determined that the dumping contributed any hazardous waste or other contamination requiring remediation.  This is true as well for the City's practice of allowing its employees to use the park for changing oil.

5. The seep and waste tar dump

The park includes a historically low spot known variously as the waste tar area, the coal tar dump or the waste tar dump.  The area was identified officially in 1951 by employees of Greeley & Hansen, the engineering firm employed by the City to design the original wastewater treatment plant.  South of the waste tar dump at the base of the bluff is an area referred to as "the seep" because it oozed tar waste before remediation efforts were first taken in 2002.  From the excavation of the area, it appears that it was been created by the outflow from a 12-inch clay tile pipe carrying tarry wastes from the gas plant.  After that pipe was identified and traced to the gas plant in 2001, plaintiff worked with the Wisconsin Department of Natural Resources on a remediation plan for the area.  In the  spring of 2002, plaintiff began excavating contaminated soil from the area and putting in clean fill.  Its contractors smashed the clay tile piping at a number of places in the filled ravine to reduce its

22

capacity to carry any flow. They also added another extraction well at the exit from the gas plant site that could be connected to a pump and treatment plant designed to minimize ongoing emulsions that might still be oozing north from the gas plant site to the seep area. With these actions, the seep dried up.

Beyond the seep to the north is an area the parties call an expansion or transition zone, and beyond that is the waste tar dump, which, as noted, is at an elevation of 600 feet, five to six feet lower than the seep area. The dump is far more heavily contaminated than the seep area, despite being farther from the gas plant. The concentrations in the transition zone are as much as 50 times lower than those in the tar dump, which is in shallow soils. Excavation in 2014 revealed tar contamination extending from the waste tar dump out to the former Pulp Hoist Road at the north end of Kreher Park. At present, the remediation plan for the park is to leave the contamination in place and place a cap on the entire park area.

A drawing prepared by Greeley & Hansen in 1951 shows a 12-inch corrugated pipe extending from the tar dump, under Marina Drive and out to the bay, through a culvert. A 2011 photograph of the area does not show any road culvert in the place shown in the drawings and no other evidence of its existence has been found, although it is possible that one was built and later removed in the intervening 40 years. The dump is at an elevation of 600 feet, MSL (mean sea level), which is lower than the designated target water level of Lake Superior at 601.7 feet. The culvert was to be built under a road that had an elevation between 604 and 605 feet. Although the bottom of the culvert would have been at least two feet below the road (taking into consideration the 12-inch diameter of the culvert and the material

between it and the road surface), it would still have been two to three feet higher than the 600-foot elevation of the dump. The more likely interpretation of the drawing is that the pipe and culvert were intended for the purpose of diverting storm water from the road and draining it into the bay.

Two existing storm water culverts can be found today, near the original treatment plant. Recent examination of the culverts disclosed no surface contamination, which was not surprising, given the absence of any surface contamination in the area. Constructing these culverts would not have dispersed any contamination.

## G. Contaminant Sampling

As part of plaintiff's remedial investigation and other cleanup efforts and in preparation for trial, various scientists took approximately 1,281 samples of the soil, sediment and other materials from 533 locations on the Ashland site to assist them in determining the sources of the polycyclic aromatic hydrocarbons (PAHs) contaminating the Upper Bluff area, Kreher Park and Chequamegon Bay. Paul Boehm, an expert in forensic and environmental chemistry, testified on behalf of plaintiff that the contamination in the park and bay came from a source other than the gas plant discharges found in the Upper Bluff. Using three different scientific techniques, (1) ratio analyses; (2) gas chromatography; and (3) principal component analysis, he concluded that measurable chemical differences could be seen between the PAHs found in the Upper Bluff and those found in Kreher Park. This led him to conclude that the source of the contaminants found in the bay was the park and specifically, the waste tar dump in the

park. Such a conclusion is hard to square with the evidence that a source of tar contamination other than the manufactured gas plant has never been found in the Upper Bluff, Kreher Park or Chequamegon Bay.

Defendants' experts identified decisions that Boehm made that could have affected his findings, such as those he made in his double ratio analyses: not using samples below a concentration of 1000 parts per million of PAHs; not using data points from the 2014 and 2015 sampling; and excluding certain low concentration samples. When defendants' experts used samples with lower concentration cutoffs and the 2014 and 2015 data, they found significant overlap in the PAHs ratios observable among the samples from all three areas: the Upper Bluff, Kreher Park and Chequamegon Bay.

In his principal component analysis, Boehm chose not to use a particular cluster of Upper Bluff samples that amounted to approximately 45, or 41% of the total Upper Bluff samples analyzed. These samples were high concentration samples and were taken from a small area that investigators believed could be the source of the contamination. Testing done by Dennis Helsel, one of defendants' experts, showed a statistical difference between this cluster and the remainder of the samples from the Upper Bluff and Kreher Park. Leaving out the cluster of Upper Bluff samples eliminated the differences observed by Boehm between the Upper Bluff and Kreher Park.

Another one of defendant's witnesses, Alan Jeffrey, an expert in geochemistry, found that some of the soil samples showed PAH components inconsistent with carbureted water gas; in his opinion, these could be explained by the different feedstocks used at the manufactured

gas plant, such as the coal used as feedstock in 1917 and 1918.  Jeffrey's testing showed that using a fuller data set for the gas chomatography testing revealed an abundance of petroleum in both areas.   Additionally, Jeffrey testified that some of Boehm's conclusions could be explained by inter-laboratory variability, which results from small variations in laboratory techniques and in technician discretion in categorization.

Another one of defendants' experts, Guy Patrick, explained that at the Ashland site, the contaminants have left behind residual PAHs and that the phenol concentrations in these PAHs have decreased as the hydrocarbons moved from the gas plant toward the bay.  This was shown by a comparison of the phenol concentration to the concentration of benzo[a]pyrene, which is a large molecule that is unlikely to have dissolved out of the PAHs during the decades since they were released into the environment.  If, as Patrick found when comparing the samples, the proportion of the phenol concentration to the benzo[a]pyrene concentration is consistent, it is likely that the materials are the same, even if the concentrations themselves have increased or decreased.  He found from his examination a continuous path of PAHs of similar concentration from the Upper Bluff to the bay, suggesting that the source was in the Upper Bluff.  He concluded that the phenols present in Kreher Park can be attributed to the coal gas process used at the gas plant in 1917 and 1918, a process that can produce phenols, sometimes at high rates.

In Boehm's data set of samples of dense non-aqueous phase liquids, which sink in water, and low density non-aqueous phase liquids, which float in water, he had more low density non-aqueous phase liquid samples from Kreher Park than from the Upper Bluff.  The

samples of low density non-aqueous phase liquids were apt to have had nearly constant contact with water, making it likely that although the difference that Boehm observed between samples appeared to be geographic, in fact, it is attributable to the loss of soluble compounds from the sample contaminants.

Boehm also did a chemical mass balancing test that supported his hypothesis that the contaminants had two separate sources. He compared this test to the act of pouring two liquid-filled beakers into one bowl and asking what proportion of liquid comes from each beaker. So long as the two beakers contain different, identifiable liquids, the chemical mass balancing test can be helpful. If, however, the two site areas (or "beakers") have no statistical difference, as in this case, the test will not identify the amount of contamination from the bay (or bowl) attributable to each source. In this case, no one has identified a likely second source of contamination. At this point, I must assume that none exists, and that Boehm's testing was flawed.

Boehm's testing fails to support a finding that the contamination in the bay has two sources. The work of the City's experts shows that any variation between the Upper Bluff and Kreher Park is insignificant and that any variation that is present can be explained by the loss of soluble compounds through weathering and by variations in laboratory techniques and technician discretion in categorization.

### H. Sources and Transport of Contamination

Kurt Herman, an environmental engineer and registered geologist, testified for plaintiff

27

that the contamination he identified in the bay came primarily from sources in Kreher Park rather than from the manufactured gas plant. I am placing no weight on his testimony because it was based on assumptions that later testimony showed to be unsupported: first, that wood preservatives had been used by the Schroeder Lumber Company while it occupied the site; second, that the gas plant had either sold or used most of its tar wastes; third, that the City had drained the waste tar dump into the bay; fourth, that the City had contributed large disposals of PAHs during the construction and expansion of its wastewater treatment plant in the 1950's and 1970's; and fifth, that "field observations confirm that most [manufactured gas plant] releases were contained within the Upper Bluff." Tr. trans., dkt. #542, at 3-P-19.

In addition, Herman testified that some of the PAHs found in the bay were from contact wastewater, that is, wastewater that had actually come into contact with the raw gas and was to be distinguished from wastewater that had not had such contact. This opinion would have merit only if any evidence showed that gas wastes from the manufactured gas plant had been discharged through the City's sewer system and there is no evidence to that effect. It was also Herman's opinion that the gas plant had treated its wastewater in its tar well, which he assumed was used for primary treatment of the wastewater. He estimated that the plant had discharged 1,500,000 million to 15,500,000 gallons of wastewater, which would have contained about 13,000 gallons of tar. He found this amount of tar much smaller than the total amount of non-aqueous phase liquids in the bay and concluded that there must be other significant sources of contamination. His conclusion does not stand up in the face of the testimony and visual evidence of the enormous quantities of tar waste on the site that have

28

either been excavated or capped.

In Herman's opinion, the introduction of a new mass of contamination from another source is the only satisfying explanation for the much greater concentration of tar in the waste tar dump than in the seep area, when the dump is farther from the gas plant and the concentrations in the dump are shallow.  The problem with this testimony is that Herman's only candidate for the source of significantly greater concentrations of PAHs is a top-down release of preservatives from a wood treating operation that did not exist.  In addition, he listed the low permeability of the Ashland soils as a second reason for thinking that gas plant wastes would not account for all the contamination in the dump, but did not take into consideration the probable permeability of the filled ravine or the highly permeable wood waste underlying Kreher Park.

Finally, Herman estimated the proportion of PAHs that would have been the consequence of urban runoff.  In doing so, however, he relied on estimates that had been made for larger urban areas than Ashland's and on the response filed by Brian Knapp on behalf of the City, which I am not considering, for the reasons set out below.


## I. Credibility Determinations

In finding facts, I have rejected certain evidence proposed by plaintiff, starting with the statements in an April 2009 response from then-City Administrator Brian Knapp to a § 104(e) request from the EPA.  The City corrected Knapp's statements in a response authorized by the Ashland City Council on August 11, 2014, Exh. CI5378, after acquiring more information.

Among other things, the City determined that "all of the sewage collected by the City in the central part of the City was carried by sewer mains to a discharge point in Stuntz Avenue," [east of the Superfund site]; the "area adjacent to the bay had no sewer service"; and "the open ditch was a private facility which carried NSP's waste to the Bay."  Ltr. to EPA, dkt. #285-1, at 3.  The evidence produced at trial supported the City Council's version of the facts relating to the sewer system and the wastewater treatment plant construction.  In light of that evidence, I find the City Council's response more credible than that of Knapp, given his far more limited knowledge of the facts in dispute at the time of his response.

I am placing no weight on the deposition testimony of Gordon Parent or Ray Parent about culverts built in the early 30's or possibly the late 40's on what was then known as Pulp Hoist Road.  Plaintiff wants to use this testimony to show that the City tried to drain the waste tar dump into the bay, but it is not sufficiently reliable.  The very age of the memories raises questions about their accuracy, as does the manner in which plaintiff obtained the information.  Plaintiff sent private investigators into the Ashland area to interview elderly residents about their recollection of certain things, including culverts, lumber treating facilities at the Schroeder Lumber Company and soil disposal in the 1930s, 40s and 50s. It declined to release most of its results to defendants or to disclose the interviewers' techniques.  As a result, it is not possible to know what techniques of questioning were used, what suggestions were made to the persons being questioned or how many other residents had similar or contradictory memories of the same subject matter.  In this case, both Gordon and Ray Parent had different memories about when the culverts might have been constructed and exactly

where they were located, which is hardly surprising given the passage of time.  In addition, it is not possible to tell from Gordon Parent's testimony whether the City or the Consolidated Pulp Hoist company built the culverts he remembers, exactly where they were located or their purpose.

Finally, I am giving no weight to the observations by Norman Peterson and City employees David Wosepka and Robert Klamerus, who testified that they had seen oily, foul-smelling substances and, in Peterson's case, dead fish in the water, during various phases of the initial construction or expansion of the wastewater treatment plant or while repairing water mains.  Their testimony suggests that they might have been observing tar waste, but it is far from definitive and there is no scientific support for the observation.  Moreover, it is of questionable value in light of the repeated soil borings that showed no contamination in the areas in which these men claim to have observed the excavated soils.

OPINION

A. Contribution Actions and Declaratory Judgments

Plaintiff Northern States Power Company brought this suit in an effort to obtain contribution from defendants for the costs it has incurred and will continue to incur under its 2012 consent decree with the EPA resolving the cleanup of the Upper Bluff and Kreher Park. Plaintiff acknowledges that it alone is responsible for the cleanup costs for the Bluff, but it seeks contribution for the costs incurred in cleaning up Kreher Park.  In addition, it asks for a declaratory judgment covering the future costs it expects to incur in cleaning up the

31

sediments in Chequamegon Bay.

1. Legal standard

      Under CERCLA, parties who have settled their liability with the EPA may bring contribution actions under 42 U.S.C. § 9613(f).  In such actions, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  § 9613(g)(2).

      To prevail in a contribution action, plaintiff must show that defendants are "covered persons" under § 9607 and must also prove the appropriate equitable share or response costs that defendants should incur.  Environmental Transportation Systems, Inc. v. ENSCO, Inc., 969 F.2d 503, 506 (7th Cir. 1992).  "Thus, [§ 9613(f)] envisions a two-part inquiry: First, the court must determine whether the defendant is 'liable' under CERCLA [§ 9607]; Second, the court must allocate response costs among liable parties in an equitable manner. . . . The party seeking contribution bears the burden of proof under both prongs of the court's inquiry."  Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 168 (2d Cir. 2002) (citations omitted) (cited approvingly by NCR Corp. v. George A. Whiting Paper Co., 768 F.3d 682, 690 (7th Cir. 2014)).  See also PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 176 (4th Cir. 2013); Elementis Chromium L.P. v. Coastal States Petroleum Co., 450 F.3d 607, 612 (5th Cir. 2006).

      Under § 9613(f), plaintiff's initial burden is to establish that either or both defendants are liable or potentially liable under 42 U.S.C. § 107(a).  To do so, plaintiff must prove the

following four elements by the preponderance of the evidence:  1) the site in question is a "facility," as defined by 42 U.S.C. § 9601(9); (2)) there has been a release or threatened release of hazardous substances at the "facility"; (3) the defendant is a "potentially responsible person" for the spill as defined by CERCLA; and (4) the plaintiff incurred response costs responding to that release or threatened release. Kalamazoo River Study Group v. Rockwell International, 171 F.3d 1065, 1068 (6th Cir. 1999). Some courts add a fifth element, that the response costs conform to the National Contingency Plan. PCS Nitrogen Inc., 714 F.3d at 167-68; ABB Industrial Systems, Inc. v. Prime Tech, Inc., 120 F.3d 351, 356 (2d Cir. 1997); Environmental Transportation Systems, 969 F.3d at 506. Defendants do not deny that plaintiff could establish elements (1), (2) and (4), all of which were conceded by plaintiff in its agreement with the EPA, so the only questions are whether defendants are "covered persons" under § 9607 and whether they are persons responsible or potentially responsible for the contamination at the Ashland site.

If plaintiff can prove that either or both defendants are covered persons and responsible for some part of the contamination, they will be entitled to recover from them under CERCLA. NCR Corp., 768 F.3d at 686. CERCLA provides two ways to pursue contribution, either under § 9607(a) or § 9613(f), depending on the procedural posture of the claim. Id. at 690. Plaintiffs who incur necessary response costs that are *not* required by court order or settlement may sue to recover them under § 9607. Plaintiffs who incur response costs that *are* required under a court order or settlement may seek contribution toward those costs from other responsible parties under § 9613. Id.; Chubb Custom Insurance Co. v. Space

Systems/Loral, Inc., 710 F.3d 946, 963-64 (9th Cir. 2013). Because plaintiff's 2012 consent decree was court-ordered, plaintiff had no choice but to proceed under § 9613(f)(1) when bringing its suit against defendants for contribution toward the costs of remediating Kreher Park. Id.

The 2012 consent decree requires plaintiff to clean up contamination in the Upper Bluff and Kreher Park as part of Phase 1 of the remediation.  Because much of this effort remains to be done, a declaratory judgment will be entered with respect to the remaining costs of this phase of the work.  United States v. Davis, 261 F.3d 1, 46 (1st Cir. 2001) (holding that declaratory judgment appropriate as to future costs under § 9613(f), though discretionary); City of Gary, Indiana v. Shafer, 683 F. Supp. 2d 836, 860-62 (N.D. Ind. 2010) (same); Appleton Papers, Inc. v. George A. Whiting Paper Co., 572 F. Supp. 2d 1034, 1046 (E.D. Wis. 2008) (same).  But see Reichhold Chemicals, Inc. v. Textron, Inc., 888 F. Supp. 1116, 1124 (N.D. Fla. 1995) ("By its explicit language, [§ 9613(g)(2)] applies only to cost recovery actions [under § 9607].").

Although the work on Phase 2 (cleanup of the sediment in Chequamegon Bay) has not begun and is not part of the consent decree, plaintiff has requested a declaratory judgment for those cleanup costs as well.  In fact, it argues that this declaration is mandatory under § 9613(g)(2), which states that "[i]n any such action described in this subsection [actions under § 9607], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."  Plaintiff's request raises an initial question: under what provision of CERCLA does

34

the request arise?  With no court order or settlement as to these costs, the request might arise under § 9607.  However, plaintiff requests an "allocation" as to these costs, which is available only under § 9613.  Moreover, plaintiff treated the court trial as one under § 9613 alone, without objection from defendants, and its agreements with the EPA clearly contemplate that it will take on the bay's cleanup, suggesting that the question is inevitably one of contribution. Defendants do not argue that a declaratory judgment is inappropriate or that it should be entered under any provision other than § 9613.

A declaratory judgment is available only when a case or controversy exists, GenCorp, Inc. v. Olin Corp., 390 F.3d 433, 451 (6th Cir. 2004) ("Entry of a declaratory judgment, however, cannot be fully mandatory" because "case or controversy" must exist.), and the planned Phase 2 cleanup is a concrete controversy under 28 U.S.C. § 2201.  Cf. New York v. Solvent Chemical Co., 664 F.3d 22, 25 (2d Cir. 2011) ("[T]his Circuit has recognized that the 'proper remedy for future response costs is not a present lump-sum payment of anticipated expenses but instead a declaratory judgment award dividing future response costs among responsible parties.'") (quoting Goodrich Corp., 311 F.3d at 175; Tosco Corp. v. Koch Industries, Inc., 216 F.3d 886, 897 (10th Cir. 2000) ("We believe where, as here, a responsible party chooses to go to trial and future response costs are likely to be incurred, but the exact amount remains unknown, a judgment on proportional liability is an appropriate remedy.").  Furthermore, because environmental litigation like this is "complex, lengthy, and expensive, . . . . [t]he costs and time involved in relitigating issues as complex as these wh[en] new costs are incurred would be massive and wasteful."  Boeing Co. v. Cascade Corp., 207

35

F.3d 1177, 1191 (9th Cir. 2000).  Accordingly, a declaratory judgment will be entered on the question of allocation between plaintiff and defendants under § 9613(f)(1) for both Phase 1 and Phase 2 costs.


2. Covered persons

The obligations imposed by CERCLA apply only to "covered persons," as defined in § 9607.  The term includes any "owner and operator of a vessel or facility"; any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of"; and "any person who . . . arranged for disposal or treatment, or transport of any hazardous substances . . ." § 9607.  Plaintiff contends that because the County owned the former Schroeder Lumber Company site (now part of Kreher Park) for a few years in the early 1940s, it was an "owner" of a "facility" "at the time of disposal of a[] hazardous substance."  As to the City, plaintiff contends that it is and has been since the 1940s an "owner or operator of a facility (Kreher Park) or, alternatively, that it owned or operated a facility "at the time of disposal of [a] hazardous substance."

The parties do not dispute that Kreher Park is a "facility" under CERCLA.  However, defendants dispute plaintiff's contention that they could be considered owners of either the park or the bay under CERCLA because only the state can own the lake bed.  Illinois Steel Co. v. Bilot, 109 Wis. 418, 425, 84 N.W. 885 (1901) ("The title to the beds of all lakes and ponds, and of waters navigable in fact as well, up to the line of ordinary high-water mark, within the boundaries of the state, became vested in it at the instant of its admission into the

36

Union, in trust to hold the same so as to preserve to the people forever the enjoyment of the waters of such lakes, ponds, and rivers, to the same extent that the public are entitled to enjoy tidal waters at the common law.")  Although Kreher Park is not under water, it is a creature of accretion and the deposits of wood waste.  State v. Trudeau, 139 Wis. 2d 91, 101, 408 N.W. 2d 337 (1987) (as general rule, manmade accretions to lands abutting a lake bed do not deprive state of its ownership rights to state's lake beds).  The State of Wisconsin advised the City in 1986 that portions of Kreher Park are the property of the state.

Defendants may well be right about their claim that they do not have legal "ownership" of Kreher Park, but this does not mean that they escape the obligations imposed under CERCLA.  As explained below, the law includes "operators" and defendant City is an "operator" of Kreher Park, which is a "facility " under both § 9607(1) and (2).  Therefore, defendant City is a "covered person."  However, the County is not a "covered person" by virtue of 42 U.S.C. § 9601(20)(D), which provides that the term "owners" does not include units of government that take title to property as a result of a tax delinquency, so long as they do not add any contaminants to the site.


a. Defendant County

The County was an "involuntary" owner of the Schroeder Lumber Company lumber yard under § 9601(20)(D), which provides that "the term 'owner or operator' does not include a Unit of State or local government which acquired ownership or control involuntarily through bankruptcy, tax delinquency, abandonment or other circumstance in which the government

37

involuntarily acquires title by virtue of its function as sovereign." The County took possession of the land only after Schroeder Lumber failed to pay its taxes. Sometime later, after the tax deed for the land had been filed, the County took a quitclaim deed from Schroeder and sold the structures back to the company. The quitclaim deed did not constitute a transfer of the land but merely clarified the County's title to it.

Even an involuntary owner can be held responsible under CERCLA if it caused or contributed to any release of a hazardous substance from the facility. 42 U.S.C. § 9601(20)(D) ("The exclusion [from being an owner or operator] provided under this paragraph shall not apply to any State or local government which has caused or contributed to the release or threatened release of a hazardous substance from the facility.") Plaintiff alleged that the County failed to clean up chemical wastes resulting from wood treating on the Schroeder site but could not prove that any wood treatment was ever done there. In addition, plaintiff failed to show that the County played any part in the demolition of the burner, smoke stacks and other structures that had been on the site when the County first acquired it. The County sold the structures back to Schroeder Lumber as part of the negotiation that resulted in the County's obtaining a quitclaim deed. It never operated the refuse burner or any other piece of equipment in the short period in which it was the involuntary owner of the property. Only after Schroeder Lumber bought back the structures were they sold to Chicago Tubing and Metals of Ashland, which made all the arrangements for the demolition.

b. Defendant City

38

Even if it cannot be deemed an "owner," defendant City is alleged to have played a part in the soil and water contamination in the park and bay while it was an operator of a facility. An "operator" must manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." United States v. Bestfoods, 524 U.S. 51, 66-67 (1998). Another district court in this circuit has held that "[m]ere oversight is insufficient." City of Waukegan, Illinois v. National Gypsum Co., 560 F. Supp. 2d 636, 641 (N.D. Ill. 2008). An operator must be actively involved on the site in some way that relates to the pollution, Litgo New Jersey Inc. v. Commissioner New Jersey Dept. of Environmental Protection, 725 F.3d 369, 382 (3d Cir. 2013), although it is not necessary that it be directly responsible for the release of the hazardous substance. Id.

It is undisputed that the City had control over the site and made a number of decisions that could have contributed to the spread of the contaminants. For example, it took soil borings and made decisions about the construction of the wastewater treatment plant based on environmental decisions. The City acknowledges that it has acted like the owner of Kreher Park since the 1940s, but it contends that it is not a "covered person" because it did not gain control over the park until 1942, after all of the releases of hazardous substances had occurred. As reasonable as this contention may seem, it is immaterial under CERCLA whether disposal occurred at the time of operation, unless the City can show that it has a statutory defense. Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 325 (7th Cir. 1994); State of New York v. Shore Realty Corp., 759 F.2d 1032, 1044 (2d Cir. 1985) ("Section

39

9607(a)(1) applies to all current owners and operators, while section 9607(a)(2) primarily covers prior owners and operators. Moreover, section 9607(a)(2)'s scope is more limited than that of section 9607(a)(1). Prior owners and operators are liable only if they owned or operated the facility 'at the time of disposal of any hazardous substance'; this limitation does not apply to current owners . . ."). See also Clear Lake Properties v. Rockwell International Corp., 959 F. Supp. 763, 769 (S.D. Tex. 1997) ("as the current operator of the contaminated facility, [Pace Analytical Services, Inc.] is a responsible party under [§ 9607(a)" even though "it did not contaminate the property and was not an owner or an operator at the time of the contamination.").

Plaintiff contends that the City is not just a covered person but that it bears significant responsibility for the dispersion of hazardous waste at the Ashland site by failing to clean up the chemical waste from the Schroeder Lumber wood treating tank; dispersing the contamination resulting from that waste; dispersing contaminated soils and allowing contaminated water to flow into the bay during the construction and later expansion of the wastewater treatment plant; maintaining an open sewer from the bottom of the bluff to the bay; draining the waste tar dump into the bay; pumping sewage into Kreher Park; allowing dumping of waste and refuse onto the park area; letting city employees use the park for oil changes for city vehicles; installing a sanitary sewer system; and repairing sewer pipes that traversed park land.

Because plaintiff has failed to prove the existence of any chemical waste left by the Schroeder Lumber Company and therefore cannot prove that the City had any chemical waste

to clean up, I will not consider the City's alleged responsibility for failing to clean up waste from wood treating chemicals or for dispersing that waste.  As for plaintiff's allegation that the City dispersed any contaminated soils in connection with the wastewater treatment plant construction, plaintiff failed to show that any such dispersion occurred.  The allegation is refuted by the repeated soil borings taken in connection with the construction and expansion, which showed no tar or tar waste contamination in the construction area and by the evidence that most, if not all, of the excavated soil and wood waste was removed to an off-site location. Even today, testing shows that the tar and tar emulsions migrating downward from the gas plant have not reached the site of the former plant.

The evidence does not support plaintiff's allegation that contaminated water entered the bay during the wastewater treatment plant construction.  The City does not deny that lake water came into the plant's construction area during the expansion period or that treated effluent was discharged, but it does not follow that this interchange of water would have added to the contamination in the bay and plaintiff has produced no proof that it did.  With the exception of the less-than-one-day discharge when the 14-inch sewer pipe broke during construction work, plaintiff adduced no evidence that any contaminated water entered the bay during construction.  Contemporaneous testing of the bay water during construction did not reveal any contamination.  Testing in 2014 showed an absence of contamination in the water that remained in the plant after it was abandoned, which tends to undermine any claim that the plant was discharging contaminated water.

Plaintiff never proved that the City built, maintained or ever used an open ditch that

ran from the base of the Upper Bluff to the bay before 1939.  In particular, plaintiff never proved that any portion of the City's sewer system connected to this ditch.  Rather, it appears to be a ditch built and maintained by plaintiff for the disposal of gas plant wastes, designed to avoid the Schroeder Lumber Company work area.

The evidence adduced at trial did not support plaintiff's allegation that Greeley & Hansen ever had designed a system to allow the City to drain the waste tar dump into the bay, much less that the City used the system.  Although plaintiff produced a drawing from the firm's archives that showed a proposed culvert and corrugated pipe leading to the bay and passing close to the dump, it never proved that this system was built or that it was intended to convey tar wastes into the bay, rather than to dispose of storm water runoff.  Plaintiff's contention that the pipe and culvert were intended to convey waste tar from the dump into the bay rests on two implausible assumptions:  First, that a reputable engineering firm would have designed, and the City approved, a means for conveying large quantities of waste tar into Chequamegon Bay, at the same time the firm was designing a wastewater treatment system facility to protect the water from contaminants; and second, that the system shown in the drawing would have achieved the purpose of draining the waste tar dump when the system was at a higher elevation than the waste tar dump.

Finally, plaintiff did not prove that any contaminants were added to the site as a result of the City's allowance of refuse dumping by city residents and oil changes for its employees or as a result of constructing the city sewer or later repairs to the sewer.

Although plaintiff introduced considerable evidence in an effort to show that the bluff

42

and park were contaminated by difference sources and that the park is the major source, it failed to prove that the sources were different in fact or that, if they were, who was responsible for the second source. Plaintiff cannot simply say there must have been a second source without showing that a particular defendant is responsible; it is not enough merely to show that some other party may be responsible. Elementis Chromium L.P. 450 F.3d at 612 ("It is El Paso, as the party bringing an action for contribution, that bore 'the burden of proving the defendant is a responsible party under [§9607(a)] of CERCLA and also the burden of proving the defendant's equitable share of costs.'") (quoting Centerior Service Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 348 (6th Cir.1998)). Plaintiff has not proven that wood treatment ever occurred at the site and it has not identified any other possible source for the significant contamination that Beoehm said was attributable to Kreher Park alone.

## B. Apportionment and Allocation

42 U.S.C. § 9613(f)(1) provides that when the court resolves claims for contributions like plaintiff's, "it may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." Although the City is a "covered person," plaintiff failed to prove that it was more probable than not that the City played any part in the disposal or dispersal of hazardous substances at the Ashland site. I conclude, therefore, that the City should not be required to make any contribution to plaintiff's remediation costs and I decline to allocate to it any responsibility for the costs of remediation of the site. Bernstein v. Bankert, 733 F.3d 190, 201 (7th Cir. 2013) ("[Section] 9607(a) grants one [potentially responsible

person] the same rights as an innocent person to sue another potentially responsible person for cleanup costs incurred in a removal or remedial action.  In such cases, the defendant's liability—although strict—need not be joint or several.  Judicial apportionment is proper so long as the defendant can demonstrate that there is a reasonable basis for determining the contribution of each cause to a single harm.") (citations omitted); Kerr-McGee Chemical Corp., 14 F.3d at 326 ("In allocating response costs among the liable parties, a court should employ such equitable factors as it determines are appropriate.")

The trial disclosed the lopsided nature of plaintiff's responsibility for the contamination. With the findings that all of the contamination is attributable to the gas plant discharges and not to any other source, the City could have added to the cost of cleanup only if it had carelessly or knowingly dispersed any soil or water previously contaminated by gas plant discharges.  Plaintiff failed to show that the City had done any of these things.  To the contrary, the evidence showed the pains taken by the City to avoid any dispersal of possibly contaminated materials, such as taking soil borings, arranging for either off-site disposal of excavated materials or their replacement in the excavation hole and testing water purity on a frequent basis during construction work on the wastewater treatment plant.   In addition, plaintiff failed to show that Schroeder Lumber had used wood treating chemicals and had abandoned them when it went out of business, that the City had maintained or used the open ditch at any time, that it had permitted the dumping of any hazardous waste or permitted oil from city vehicles to be deposited on the site, that it had ever conveyed tar or tar waste through its sewer system or that it had allowed the sewer system to discharge through or into Kreher

Park.

Beyond the lack of factual evidence adduced by plaintiff to support its claims that the City dispersed gas plant wastes, the trial evidence supports the equitable considerations that militate in the City's favor.  Plaintiff has far greater resources to absorb the substantial cost of remediation.  These resources include at least $25,000,000 in insurance plus the money plaintiff has obtained in settlement with former defendants.  In addition, plaintiff has the ability to charge the remediation costs to its ratepayers, many of whom are also City residents, and who would be required to contribute to the payment of any remediation costs imposed on the City through their property taxes, in addition to paying higher rates.

By contrast, the City has little insurance or other resources that would be available for contribution.  Its borrowing limit is approximately $11,000,000.  $4,400,000 of that amount was approved in a recent referendum and includes $3,500,000 to upgrade the more than 90-year-old fire stations that cannot accommodate modern pumpers, together with about $900,000 for long overdue road work within the City.  State law places strict limits on a municipality's ability to tax its residents for projects such as the badly needed upgrade in the City's water system and replace its water tower, which is expected to cost about $28,000,000, or for make improvements in the sewer system, such as replacing long outmoded vitrified clay pipes, which will cost about $20,000.000.

The City has a declining population.  Its residents are older and poorer than the average citizen in other parts of the state.  16.4% of the population lives below the poverty line and the unemployment rate is 7.9%.  The City has received no financial benefit from the park area,

45

whereas plaintiff's predecessor received significant financial benefits from the operation of the gas plant. It may be that in the long run, the City and its residents will benefit from an uncontaminated park and the construction of the breakwater required to allow the remediation of the bay. At this point, it is still too early to know whether the park can ever be remediated sufficiently to allow the full range of park activities. Even if it can be, the remediation will not put the City in any better position than it would have been had the contamination never occurred.

The City has cooperated in the cleanup. Finally, even if City were found to have some degree of liability because it dispersed some of the contamination in Kreher Park unknowingly, it did so only because plaintiff's predecessor allowed hazardous substances to migrate underground throughout the Upper Bluff, Kreher Park and the bay.

In making this determination about contribution and allocation, I am not taking into consideration any "orphan share," that is, liability attributable to an entity that no longer exists or is insolvent. Ninth Ave. Remedial Group v. Allis Chalmers Corp., 974 F. Supp. 684 (N.D. Ind. 1997). It is not necessary to do so, now that defendants have disproved plaintiff's claim that the Schroeder Lumber Company left wood treatment chemicals at its yard in Ashland.

ORDER

IT IS ORDERED that

1. Plaintiff Northern States Power Company's suit against defendant Ashland County is DISMISSED because I conclude that defendant County was not a "covered person" under

CERCLA;  the clerk of court is directed to enter judgment for this defendant; and

2. Defendant City of Ashland is liable for response costs only as a "covered person" under 42 U.S.C. § 9607(a)(1); and defendant City is allocated $0 for response costs already incurred by plaintiff in remediating the Ashland Superfund site.

FURTHER, IT IS DECLARED that liability for all future response costs incurred at the Ashland Superfund site in any phase of the remediation of the site that are either

(1) prescribed by settlement, agreement, court order or consent decree with the United States or with any other entity with regulatory authority over the Site; or

(2) "necessary" and "consistent with the national contingency plan," within the meaning of § 9607(a)(4)(B)

are to be allocated 100% to plaintiff and 0% to defendant City.

Entered this 11th day of September, 2015.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge